Monty Allen **DELK**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 70305.

Court of Criminal Appeals of Texas,
En Banc.

April 21, 1993.

Rehearing Denied May 19, 1993.

William M. House, Jr., Palestine, for appellant.

Richard Handorf, Dist. Atty. and Joe Bridges, Asst. Dist. Atty., Palestine, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.[o]

Appellant was convicted of the offense of murder committed in the course of a robbery under V.T.C.A. Penal Code § 19.-03(a)(2), and in accordance with the jury's affirmative answers to special issues under Article 37.071, § (b)(1) and (2), his punishment was assessed at death. Appeal to this Court is automatic. *Id.,* § (h).

While appellant does not challenge the sufficiency of the evidence to support his conviction, we believe that a short recitation of the facts is necessary. In November of 1986, Gene Olan "Bubba" Allen II, the deceased, and his wife Sheila, were running an ad in the Houston County Courier offering to sell a Chevrolet Camaro. On Friday, November 28, a man called and spoke to Sheila about the car. She remembered that "part of" the man's name was "Allen" because she had said to him, "Oh, that's our last name too." The man told her he was calling from a pay phone, that he had no transportation, and wanted the Camaro brought to the parking lot of Brookshire's Grocery Store, in Crockett, so that he could test drive it. It was shown that at this time appellant had just been evicted from a rooming house a block and a half away from Brookshire's, and that residents of the rooming house had to use a pay phone across the street. Appellant had recently lost his Volkswagen to another resident in a poker game. Also, within the last month he had bought a shotgun and sawed it off.

Bubba Allen left his house at about 9:00 a.m. on Saturday, November 29, to wash the Camaro and then meet the caller from the day before. At the time he had at least one $100 bill in his wallet, along with a payroll check. Sheila next saw her husband at 11:00 or 11:15 that morning as she was passing through Crockett, riding in a

car driven by her sister. Coming upon an intersection, she saw the Camaro pull up from the opposite direction. She could see Bubba in the passenger side, and a man she positively identified as appellant, driving. Appellant was wearing an army jacket.

Shortly before 1:30 p.m. that day Bubba Allen's body was found in a ditch beside a fairly remote stretch of road three miles south of Palestine, in Anderson County. When emergency units arrived and turned the body over, it was limp and blood still oozed from a shotgun wound above and behind the left ear. Allen's wallet was missing. A neighbor a hundred yards down the road had heard a single gunshot at 1:00 p.m. Sometime between 1:30 and 2:00 p.m., a woman who knew Allen saw what she took to be his Camaro twenty-eight miles south of Palestine, heading toward Crockett. The only person she could see in the Camaro was a man, but it was not Allen.

About 5:30 p.m. appellant showed up in Jasper and talked Phillip Johnson into accompanying him to New Orleans. Johnson observed a sawed-off shotgun in the Camaro, and also noticed appellant had an atypical amount of cash in his possession. At first appellant told Johnson he was purchasing the Camaro from a relative named "Bubba." Later he told Johnson "he killed somebody and got $75." Asked whether appellant had seemed nervous, Johnson testified he had been "shaky a lot." Along the way appellant disposed of a wallet that fit the description of the one that had belonged to Allen, explaining that "he had to get rid of some evidence." Johnson saw appellant tear up a check and throw it out the window, purportedly because he could not cash it.

Appellant and Johnson were arrested in Winnfield, Louisiana, on December 2, 1986. The Camaro was registered in the name of

"Gene Allen II," although appellant told police he had borrowed the car from his sister. Inside the car police found the sawed-off shotgun, later shown to be consistent with the weapon that had killed Allen. They also recovered an army jacket. In his wallet appellant carried a photograph of Sheila Allen, taken from Bubba Allen's wallet, as well as a copy of the ad from the Houston County Courier listing the Camaro. At the police station appellant threatened to kill Johnson if he said anything.

## I.

In his first point of error, appellant complains of the trial court's decision to not allow impeachment of State's witness Phillip Johnson through proof of a prior conviction. Appellant asserts that Mr. Johnson left a false impression on the jury that he had never been in a courtroom before. Appellant further believes that his was a case based primarily on circumstantial evidence, a substantial portion of which was the testimony of said witness. He argues, therefore, that the credibility of this witness was crucial to the State's case.

The State filed a pre-trial motion in limine to prevent impeachment with two prior convictions. The motion was sustained.[1] However, appellant believes that questions during direct examination of this witness "opened the door" about his criminal history and appellant should have therefore been allowed to delve into these matters. The transcript reveals the following:

.    .    .    .    .

Q: (by the State) Okay. Phillip, are you nervous?
A: (by Mr. Johnson) Yes, sir.
Q: Is this the first time you've ever been in a courtroom—
A: Yes, sir.
Q: —as a witness?

---

1. The State relied on Tex.R.Crim.Ev. 609 when urging its motion in limine pertaining to two prior convictions secured against Phillip Johnson. In accordance with Rule 609(a), the State argued that the witness could not be impeached with a prior conviction for telephone harassment since it was a misdemeanor which did not involve moral turpitude. Additionally, the State contended that Rule 609(c)(2) directed that the witness could not be impeached through the use of a prior felony conviction for unauthorized use of a motor vehicle since it did not involve moral turpitude, probation was assessed, and the probation was satisfactorily completed.

A: Yes, sir ...

The State asserts that Mr. Johnson's first answer was non-responsive because he interrupted the prosecutor before he completed his question. The State asserts that Mr. Johnson's premature answer was indicative of his response to the preceding question, where he said he was nervous. The State argues that the initial answer given by Mr. Johnson should be ignored and the two questions viewed as one.

When attacking the credibility of witnesses, evidence of prior criminal convictions shall be admitted only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value outweighs its prejudicial effects to a party. Tex.R.Crim.Ev. 609. However, an exception to Rule 609 applies when a witness makes statements concerning his past conduct that suggest he has never been arrested, charged, or convicted of any offense. *Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Cr.App.1988); *Hammett v. State*, 713 S.W.2d 102, 105 (Tex.Cr.App.1986); *Ochoa v. State*, 481 S.W.2d 847, 850 (Tex.Cr.App. 1972). Where the witness creates a false impression of law abiding behavior, he "opens the door" on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood. *Prescott v. State*, 744 S.W.2d, at 131; *Hammett v. State*, 713 S.W.2d, at 105; *Ochoa v. State*, 481 S.W.2d, at 850.

In *Prescott*, the trial court allowed the State to impeach a defendant who had used the phrase "this is my first time going through *this* " when responding to a question about his attorney's decision to secure two statements on one day. *Prescott v. State*, 744 S.W.2d, at 130 (emphasis added). Even though defense counsel clarified his client's answer during subsequent voir dire, the trial court believed that the defendant created a false impression about his criminal history. *Id.* It therefore allowed the prosecutor to delve into a felony conviction which was secured against the defendant one year earlier. *Id.* In finding the trial court's decision to allow impeachment in error, this Court focused on the defen-

dant's answer in relation to the question he was asked. *Id.*, at 131. Since the question pertained to the defendant's opinion of legal procedures employed by his attorney, we did not believe that the defendant's use of the phrase "going through this" suggested that he had never been the subject of a criminal proceeding. *Id.*, at 131–132. We held that the defendant's answer was responsive to the question asked and the obvious interpretation of the answer was that he had no opinion as to whether his attorney's decision to take two statements on one day was appropriate or unusual. *Id.*, at 131.

In *Hammett*, the defendant was charged with driving while intoxicated. *Hammett v. State*, 713 S.W.2d, at 101. On direct examination, he was asked about a prior conviction for public intoxication. *Id.*, at 104. His attorney followed-up this inquiry with "Is that the only time you have been arrested for *public intoxication*?", to which the defendant answered "Yes, sir." *Id.* (emphasis added). The prosecutor then argued that the defendant had created the impression that he had never been arrested for any other offenses than public intoxication. *Id.* The prosecutor therefore believed that he should be allowed to ask the defendant about other convictions secured against him. *Id.* The trial court agreed and allowed questioning on a prior conviction for criminal mischief. *Id.*, at 104–105. In holding that it was error to admit the prior conviction for impeachment purposes, we found that when determining to what extent a colloquy "opened the door", it is important to examine how broadly one would interpret the question that was asked. *Id.*, at 106. In our analysis, we recognized that intonation is very important when attempting to reveal the import of a question. This court therefore looked for any evidence in the record that would reflect the tenor of the question. *Id.* Finding none, we assumed the question was asked just as it appeared in the record and that the tenor was no different than the "black letters" reflected. *Id.* Additionally, we believed that the major substantive issue in the case would influence how broadly the question would be inter-

preted. *Id.* Since the issue here was whether the defendant was intoxicated when his vehicle was stopped, we found that the narrower import of the question was the more likely interpretation, i.e. that he only had one conviction *for public intoxication. Id.* (emphasis added). We therefore found that it was error to allow the State to question him about the prior misdemeanor conviction since the defendant did not open the door. The matter was then sent to the Court of Appeals for a determination of harmfulness. *Id.,* at 106–107.

The defendant in *Ochoa* failed to object when the State inquired into his prior criminal convictions. *Ochoa v. State,* 481 S.W.2d, at 849. The State initiated the line of questioning after the defendant failed to mention four prior convictions during direct examination. *Id.,* at 849. However, since the defendant did not properly preserve error for appeal, this Court did not rule on whether he fully "opened the door" by not detailing his entire criminal history. *Id.,* at 850. Neither was there a finding about whether it was proper for the State to inquire into his prior convictions. See *Id.* We did hold, however, that where a defendant details his convictions and leaves the impression that there are no others, "the State may refute the testimony despite the nature of the conviction used or its remoteness." *Id.*

In accordance with *Prescott,* supra, we will examine Mr. Johnson's response in connection with the question he was asked. When Mr. Johnson gave his initial response, the prosecutor had not finished his question. The question, in full, was "is this the first time you've been in a courtroom as a witness." The response to the *complete* question was "Yes, sir." When Mr. Johnson interrupted and gave his first answer, it was non-responsive. However, when the inquiry was asked in its entirety, the door to Mr. Johnson's criminal history was not opened since the answer to the question was not a misleading response.

Unlike the questions at issue in *Hammett,* supra, the record here reflects some intonation that sheds light on the true ten-or of the question. Although Mr. Johnson prematurely answered the question, the record indicates the interruption with a "—" at the end of the prosecutor's first question. Additionally, unlike the line of questioning in *Hammett,* the prosecutor here immediately completed his question with the phrase "as a witness" so that the complete question would be properly reflected in the record. We therefore believe that the broad interpretation (as suggested by *Hammett*) would be to view the question in its complete, intended form. When this is done, we find that it did not open the door to impeachment of the witness. See *Theus v. State,* 845 S.W.2d 874 (Tex.Cr. App.1992).

Because Mr. Johnson's answers did not leave a false impression and therefore did not open the door to impeachment, we hold that it was not error to prevent appellant from inquiring into Mr. Johnson's criminal history. Appellant's first point of error is therefore overruled.

## II.

In his second point of error, appellant argues that the trial court erred in admitting an in-court identification made by the wife of the complainant.

Sheila Allen testified that on Saturday, November 29, 1986, her deceased husband Gene Olan Allen II, met a man who was interested in buying his Camaro. Mrs. Allen did not go on the test drive. Instead, she went on an errand with her sister. During the process of this errand, she encountered the Camaro. At trial, she testified that her husband was in the passenger seat. Although the passenger side window was up in the Camaro, the driver's side window was down. From the passenger seat of her vehicle she could also tell that the driver was a male who was wearing an army jacket. He had brown, curly hair, his hand was out of the window, and one of the sleeves on the jacket was pushed up.

Based on her observations, Mrs. Allen made a statement to the police on August 25, 1987. The statement basically included the same description which she gave during her in-court testimony. After she complet-

ed her statement, she asked the Sheriff whether she could see a picture of the man who had been arrested for the murder of her husband. The Sheriff complied with her request. She then verified that the person in the photograph was the person whom she had seen driving the Camaro. Appellant believes that since Mrs. Allen was shown the photograph at the time she gave her statement and knew the man in picture was under indictment for the murder of her husband, it is now impossible to determine whether she would have identified appellant without having been shown the photograph.

A two-step analysis is used to determine the admissibility of an in-court identification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Cantu v. State*, 738 S.W.2d 249 (Tex.Cr.App.1987). First, the photographic display must not be impermissably suggestive. The second factor dictates that the suggestive procedure must not give rise to a very substantial likelihood of irreparable misidentification. A totality of the circumstances approach is used in this second step. *Manson v. Brathwaite*, 432 U.S. 98, at 114, 97 S.Ct. 2243, at 2253, 53 L.Ed.2d 140 (1977); *Cantu v. State*, 738 S.W.2d at 252. The approach includes the following considerations: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation. *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. "These and other pertinent factors are weighed against the 'corrupting effect of the suggestive identification itself.'" *Cantu v. State*, 738 S.W.2d, at 252, quoting *Manson v. Brathwaite*, supra.

The identification testimony will be admissible if the indicia of reliability outweigh the apparent corrupting effect of the unnecessarily suggestive pretrial occurrence. *Harris v. State*, 827 S.W.2d 949 (Tex.Cr.App.1992). The burden is on the defendant to show by clear and convincing

evidence that the in-court identification is unreliable. *Id.*, at 959; *Madden v. State*, 799 S.W.2d 683, 695 (Tex.Cr.App.1990), cert. denied, —— U.S. ——, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991).

Turning to the first step of the analysis, we find that the photograph was impermissably suggestive. Mrs. Allen was only shown one picture. It was presented to her as the person who was in custody, under indictment, for the murder of her husband. It is possible that this procedure suggested to Mrs. Allen that the Sheriff believed appellant was the person who killed her husband. However, this does not end our inquiry in determining the reliability of the in-court identification. We must also address several other factors in deciding whether this created a substantial likelihood of irreparable misidentification.

## A. OPPORTUNITY TO VIEW

Mrs. Allen's opportunity to view the person who was with her husband was limited to the time that the two vehicles were at the intersection. Both cars were at a four-way stop. However, there is no indication of how much space there was between the vehicles. Nor was there any evidence of how fast the vehicles were going when they passed each other. Shorter distances between the vehicles and slower speeds could have allowed her to see the driver for significantly longer than merely when the cars were stopped at the intersection. During cross-examination, Mrs. Allen estimated that the vehicles were at the intersection for approximately fifteen seconds; however, this time period could have been longer depending on the aforementioned speed and distance variables. While the length of the encounter is a consideration, we do not necessarily find it controlling.

## B. DEGREE OF ATTENTION

Mrs. Allen's testimony revealed that she was very attentive when she saw her husband at the intersection. Her description of the man driving the car was fairly detailed, indicating that she examined the car and the passengers very closely while she

was at the stop sign. She testified that both windows in her vehicle were down, that the driver's side window of the Camaro was down, and that the driver had his hand out the window. She was also able to recall that the driver was wearing an army jacket and one of the sleeves was pushed-up. Additionally, she stated that she paid special attention because she was interested in seeing the man whom she talked to on the phone. This was corroborated by the testimony that she turned her head to get a good look at the driver when the two vehicles passed in the intersection. The amount of detail she was able to recall demonstrates that she was very attentive when she saw the person who was test driving her husband's car.

## C. ACCURACY OF DESCRIPTION

Mrs. Allen gave a fairly detailed description as pointed out above. Appellant offered no proof at trial to refute it. Circumstantial evidence existed which actually supported her description. Specifically, when appellant was arrested he was found in possession of the Camaro and an army jacket was found inside.

## D. LEVEL OF CERTAINTY

A high degree of certainty surrounded Mrs. Allen's identification. In all, she recalled the details surrounding the identification three times. First, she gave a statement to police nine months after her husband was killed. Next, she was called upon to recite the details of the identification at the motion to suppress the in-court identification. Finally, she was asked about the identification during direct and cross-examination. On all occasions, her testimony was consistent. She further testified that her ability to identify the person who was driving the car as appellant was not based on the picture. She fervently stated that she could have identified appellant if she had not seen the photograph.

## E. TIME BETWEEN CRIME AND CONFRONTATION

The Allen's car was stolen on November 28, 1986. Appellant's trial took place in May of 1988 meaning eighteen months had passed since Mrs. Allen had seen the person driving the Camaro. We believe, however, that this does not detract from the identification given the details she was able to recall and the consistency in her testimony.

## F. OTHER CONSIDERATIONS

In addition to the aforementioned factors, we find two other considerations surrounding the identification of import. First of all, it is evident that Mrs. Allen had a very high degree of concentration. She stated that she had talked to the potential buyer the night before on the phone and was very interested in finding out who he was. Additionally, she remembered that she turned her head to look at the other vehicle as the cars went through the intersection. We believe this demonstrated her heightened level of awareness and lends credibility to her statements that she could have identified appellant independent of the photograph.

We also find the timing of the statement and the presentation of the photograph significant. Mrs. Allen gave her statement before she was shown the photograph. The statement reflects that Mrs. Allen remembered significant details about the day she saw someone in the car with her husband. The degree of detail shows that she has a keen memory and reduces the likelihood that she was reliant on the photograph to identify appellant at trial.

In summary, Mrs. Allen's identification has a high indicia of reliability given the details she was able to recall and the repeated, consistent testimony. There is no evidence that Mrs. Allen's in-court identification of appellant was based solely on the photograph shown to her by the Anderson County Sheriff. Nor is there any evidence that her initial description of the person riding in the car with her husband was inaccurate or that she ever identified anyone else as the person in the car. Appellant therefore has not shown by clear and convincing evidence that the in-court identification was unreliable. From the totality of the evidence before him, the trial judge

could reasonably conclude that Mrs. Allen's testimony was reliable despite the unnecessarily suggestive pretrial occurrence. Consequently, appellant's second point of error is overruled.

### III.

By way of point of error three, appellant challenges the sufficiency of the evidence to establish the second special issue, maintaining the jury could not rationally have found "there is a probability that [he] would commit criminal acts of violence that would constitute a continuing threat to society[.]" Article 37.071, § (b)(2), supra.

The State maintains that appellant had long planned to commit an offense of this type and the evidence was sufficient to support the jury's affirmative answer. At the punishment phase of trial the State presented testimony that on past occasions appellant had contemplated crimes similar to the one he eventually committed. Richard Frye, appellant's brother-in-law, testified that on one such occasion he accompanied appellant to Houston where they drove around while appellant talked about finding a person or place to rob. Frye maintained he never intended to help appellant perpetrate any crime, but was trying to get appellant out of the house because he had been threatening his wife, Frye's sister. They actually robbed nobody.

Tina Delk, appellant's wife, testified that she left appellant because she was "tired of him hitting me and trying to get me to do bad things, go out and kill people." On "several" occasions appellant would plot robberies:

> "Well, he looked through the paper, and he would see an ad for something like a ring, a diamond ring, worth a lot of money; and the plan was we would go to their house, say we were married and everything, see how many people were in the house, and hold them at gunpoint, tie them up and take their valuables and shoot them in the head and leave."

Sometimes appellant would take Tina out driving "for hours and hours[,]" looking for isolated places where he could take

people and "shoot them in the head." Appellant also "liked sports cars."

Evidence presented by the State at punishment proved that appellant told both his wife and Frye that he had killed a man in Florida. Neither witness believed this claim and it was substantiated by no other evidence. Appellant made a death threat against a fellow employee during a dispute at a lumber mill. While training as an assistant manager of a Pizza Hut, appellant had a mishap involving a pan of spaghetti, and when another employee laughed at him, he threatened to get a gun from his car and "blow a hole in [her] head, and ... stick the gun to [her] stomach and kill [her] baby." Appellant threatened his wife's mother when she came to retrieve her daughter. After his wife did leave him he told her former employer she would "live to regret" not informing him where his wife had gone. Appellant did physically abuse his wife, and once pulled a shotgun on her, although she faced him down. He always kept a shotgun in his Volkswagen. During his year and a half of what amounted to solitary confinement in the county jail awaiting trial, appellant made death threats against jail staff. He was once overheard to tell a visitor at the jail that "Tina and Philip could not find a corner on the face of the earth that he would not find them, and they were history."

It was thus shown that appellant had a history, albeit brief, of what in most cases would be considered the least serious of the crimes of violence under our penal laws, viz: simple assault. V.T.C.A. Penal Code, § 22.01(a)(2) & (c). On one occasion, while holding a shotgun to his wife, he apparently committed an aggravated assault. V.T.C.A. Penal Code, § 22.02(a)(4). Although no such threat of violence ever came to fruition until commission of the instant offense, the threats themselves tend to show a predisposition towards violent conduct under conditions amounting to less than substantial provocation. Appellant showed no compunction about threatening to kill, if not actually killing, even after he was arrested for the instant offense. Moreover, there is evidence that in killing Allen appellant was acting out what

in the particulars may have been a hastily devised plan, but what in its general outline represented a long-recurring fantasy. Though we perceive the evidence of future dangerousness in this cause to be minimal, viewing it in the most favorable light, we cannot say a rational jury could not have found appellant would commit criminal acts of violence that would constitute a continuing threat to society. See *Burns v. State,* supra, and cases cited at 355–56. Appellant's third point of error is therefore overruled.

### IV.

In points of error four and five, appellant complains of the trial court's denial of his request to give an instruction to the jury on how to apply mitigating evidence in answering the special punishment issues. Specifically, in point of error four, he argues that *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), dictates that he was entitled to such an instruction so that the jury could give a reasoned, moral response to his background, character and crime.

Appellant's mother testified that he had numerous father figures during his childhood. His natural father divorced his mother when appellant was one year old. Her second husband was killed in a boating accident when appellant was five years old. Her third marriage to an individual named Phillip Green lasted for three years. Green was abusive to both appellant and his mother. Appellant's mother married yet a fourth time and up until the time of the offense appellant continued to maintain a fairly good relationship with him. Appellant implies that the brief reappearance of his natural father when appellant was fourteen had some effect on him, however there is nothing in the record to support this.

Appellant also brings special attention to his grandfather's testimony. While he stated that appellant spent two or three months at a boys' ranch near Ft. Worth, the record is devoid of anything which indicates the reason for the stay or the impact it had on him. Like appellant's mother, he too brought attention to the unstable home environment during appellant's youth.

Unlike the evidence of moderate mental retardation and organic brain damage presented in *Penry,* proof of a disruptive background or tragic family life is unrelated to any aspect of how or why the death penalty would be an appropriate or inappropriate response to a defendant's actions. *Trevino v. State,* 815 S.W.2d 592, at 622 (Tex.Cr. App.1991). Furthermore, the second special issue provides a vehicle for the jury to express its reasoned moral response to evidence of a disruptive family life. *Goss v. State,* 826 S.W.2d 162, 166–167; *Lackey v. State,* 819 S.W.2d 111, 134 (Tex.Cr.App. 1989); *Trevino v. State,* 815 S.W.2d, at 621–622.

Since appellant presented evidence of a turbulent family life identical to that addressed in *Goss, Lackey,* and *Trevino,* supra, we find those cases controlling. Consequently, we hold that this evidence was within the ambit of the second special issue. Appellant's fourth point of error is therefore overruled.

Appellant then alleges in point of error five that the Texas statutory scheme for imposing the death penalty is unconstitutional as applied to him. However, appellant fails to indicate whether the scheme violates protection afforded by the Texas Constitution or the United States Constitution. Nor does appellant provide any authority for this proposition as required by Tex.R.App.Proc. 74(f). We decline to make appellant's state constitutional arguments for him. Point of error five is therefore overruled.

### V.

In his sixth point of error, appellant argues that his driver's license, proof of vehicle registration, his wallet, and a photo of the deceased's wife found in the wallet should not have been admitted into evidence at trial. Specifically, he asserts that these items were the product of an illegal search and seizure under the fourth amendment to the United States Constitution.

Testimony at trial established that on December 2, 1986 a police officer in Winn-

field, Louisiana, ran a license check on a vehicle with Texas license plates that was seen on the streets of Winnfield. The report came back that the car was stolen, the owner had been a victim of a homicide, and Texas authorities wanted the vehicle held for latent fingerprints. However, by the time it came back, the officer was no longer following the vehicle. The car was found later the same day parked in front of a house at 405 Elliot St. in Winnfield. Several other officers were called to assist at the scene. Sometime around 4 p.m., two policeman then proceeded to the front door and asked all occupants of the house to come outside. Meanwhile, approximately four other officers went to the back of the house. Although most of the people in the residence complied, appellant and Phillip Johnson remained in the house. When they were advised to come outside a second time, they cooperated. They were then asked for identification. Appellant produced a Texas Department of Public Safety Driver's License. When an officer asked who was the driver of the vehicle, appellant identified himself and stated that it belonged to his sister. Appellant was then asked for registration of the vehicle and he produced a receipt for a Texas license plate sticker. It was in the name of the deceased. A second check of the car was run using the vehicle identification number found on the receipt and the report once again reflected that the auto was stolen. Appellant and Phillip Johnson were then handcuffed, read their Miranda rights, and taken to the police station. Upon arrival, appellant's pockets were emptied and he was placed in a room which is normally used to hold public intoxication suspects. He was to be held until more information could be obtained from Texas authorities. Additional information was received from Texas sometime before 6 p.m. and a Louisiana search warrant was issued for the car. The search was conducted at approximately 6:23 p.m. An inventory was made of the items found during the search including a sawed-off shotgun. One of the Louisiana police officers testified that appellant was formally arrested at 11:15 p.m.

Appellant believes that no probable cause existed to justify this arrest. Furthermore, while not conceding that the police had a reasonable suspicion to detain him, appellant believes that the actions of the Louisiana police officers exceeded the sort of temporary detention and investigation permitted under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Although he asserts that *Terry* allows a momentary detention of someone in a public or semi-public place, he does not believe the facts here amounted to a temporary stop. Specifically, he argues that the police officer's actions of encircling a house and demanding that a person exit into the presence of several police officers exceeded the *Terry* temporary detention guidelines.

If police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter is involved in criminal activity, they may investigate that suspicion by making a stop to check identification, posing questions to the person, or detaining them briefly while attempting to obtain further information. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Terry*, supra. Such a temporary detention is known as a "Terry" stop. See *United States v. Hensley*, 469 U.S., at 226, 105 S.Ct., at 678–79. Furthermore, if a flyer or bulletin has been issued by a police department on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin by another police department justifies a *Terry* stop. *Id.*, at 232, 105 S.Ct. at 682. It is the objective reading of the flyer or bulletin that determines whether other officers can defensibly act in reliance on it. *Id.*, at 232–233, 105 S.Ct. at 682–83. Moreover, if the police make a *Terry* stop in objective reliance on a flyer or bulletin, evidence uncovered in the course of that stop is admissable if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop. *Id.*, at 233, 105 S.Ct. at 682–83. However, the stop may not be significantly more intrusive than would have been permitted by the issuing department. *Id.*, at 233, 105 S.Ct. at 682–83.

In *Hensley*, the defendant challenged the legality of a temporary stop which was made based on a "wanted flyer" issued by a police department in a neighboring state. *United States v. Hensley*, 469 U.S. at 223, 105 S.Ct. at 677. Police officers in St. Bernard, Ohio, a suburb of Cincinnati, issued such a flyer for the defendant based on information obtained at a robbery. *Id.* It stated that he was wanted for investigation of the robbery, described him, the date and location of the robbery, and asked other police departments to detain him if they encountered him. *Id.* Officers in Covington, Kentucky, another Cincinnati suburb, were familiar with the defendant and saw him six days later in a vehicle within the Covington city limits. *Id.* Unable to recall whether a warrant for the defendant was outstanding, the defendant was temporarily detained while a radio check was run. *Id.* at 224, 105 S.Ct. at 677–78. During this detention, one of the police officers recognized the passenger as a convicted felon. *Id.* While looking inside the passenger window, he saw a handgun protruding from underneath the passenger's seat. *Id.* A search of the car was then performed which revealed two more guns. *Id.* at 224–225, 105 S.Ct. at 677–78. The defendant moved to suppress the firearms from evidence on grounds that the Covington police had stopped him in violation of the Fourth Amendment and the principles announced in *Terry*. *Id.* at 225, 105 S.Ct. at 678. The Supreme Court held that if a wanted flyer has been issued on the basis of articulable facts supporting a reasonable suspicion that the person wanted has committed an offense, then reliance on that flyer justifies a stop to check identification, to pose questions, or to detain the person briefly while attempting to obtain further information. *Id.* at 232, 105 S.Ct. at 682. Further, the court held that assuming that the police can make a *Terry* stop in reliance on a flyer, the evidence uncovered in the course of the stop is admissable if the police who issued the flyer possessed a reasonable suspicion justifying the stop, so long as the stop that occurred was not significantly more intrusive than would have been permitted the issuing department. *Id.*, at 233, 105 S.Ct. at 682–83.

In the instant case, a curious police officer ran a check on a vehicle while it was on the public streets of Winnfield, Louisiana. From this check, the officer discovered via the NCIC computer that the car was stolen. The information in the computer was based on a bulletin issued by Texas authorities, much like the bulletin in *Hensley*. We find that in this case, the information on the NCIC computer report lead the officer to believe, based on his experience, that he could defensibly act in reliance on it. The information from the computer supplied the Louisiana police officers with the reasonable suspicion to question appellant at the house at 405 Elliot St. In response to said questioning, appellant stated that the car was under his control although it was owned by his sister. When appellant was asked for proof of ownership, he produced a receipt for a Texas license plate sticker that was in the name of the deceased owner. A second check of the vehicle was performed based on the vehicle identification number to verify the initial report. Once again, it showed that the car was stolen and the owner was a victim of a murder. Appellant was therefore in possession of a stolen car that may have been connected with a homicide. At this point the reasonable suspicion held by the officers elevated to probable cause to arrest appellant for not only auto theft, but also suspicion of murder. Since probable cause existed, justification for the temporary detention ceased to be required. Unlike the firearms uncovered in *Hensley*, appellant was formally, lawfully under arrest when the drivers license, insurance card, wallet and photo were discovered. In this respect, *Hensley* was no longer controlling since it addressed evidence uncovered in the course of a temporary detention.

We note that Deputy Doug Prescott testified that appellant was not formally under arrest when he was transported and detained at the Winnfield police station. He stated that appellant was merely detained for questioning. We disagree.

When the second NCIC report came back, appellant was placed in handcuffs, read his Miranda rights, and put in a squad car. He was *not* free to leave. He was, however, under lawful arrest based on probable cause.

Since the drivers license, insurance identification card, wallet, and photo were the products of a lawful arrest, they were properly admitted at trial. Appellant's sixth point of error is therefore overruled.

Having considered each of appellant's six points of error, we do not believe that any of them merit reversal of the judgment of the trial court. Appellant's conviction and his sentence of death are affirmed.

MALONEY, J., concurs in point of error no. 4; otherwise he joins the remainder of the opinion.

CLINTON, Judge, dissenting.

In his fourth point of error appellant complains that the trial court erred in failing to give requested jury instructions at the punishment phase of trial which would allow the jury to effectuate a "reasoned moral response" to evidence adduced at the punishment phase of trial having mitigating significance beyond the scope of the special issues contained in Article 37.071, § (b), supra. I agree.

In *Gribble v. State*, 808 S.W.2d 65, at 75 (Tex.Cr.App.1990), the Court observed:

"The Texas capital sentencing scheme does not invariably operate in such a way as to violate the Eighth Amendment. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). But, at least whenever a capital defendant produces evidence of his own character, background, or the circumstances surrounding his offense which, according to contemporary social standards, has a tendency to reduce his moral culpability in a way not exclusively related to the deliberateness of his criminal conduct, the provocative behavior of his victim, or the probability of his future dangerousness, the United States Constitution forbids imposition of the death penalty upon him by a sentencer given no means to prescribe, based on such mitigating evidence, a less severe punishment. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)."

Appellant was nineteen years old at the time he committed the instant offense. His mother testified that soon after appellant was born they were abandoned by appellant's natural father. She was then sixteen, and took appellant home to live with her parents. When appellant was almost five she remarried a man appellant "loved very much," but this man died three and a half months later in a boating accident. His stepfather's death had a "large effect" on appellant. Later that same year appellant's mother again remarried, this time to a man who proved abusive to both appellant and his mother. After three years they divorced. Appellant was raised by his mother for the next three years, after which she married yet again. Her fourth husband shared a "fairly good" relationship with appellant. For six or eight weeks when appellant was thirteen or fourteen years old, appellant's natural father, who had married again, resurfaced in his life. But when that marriage fell apart, appellant never saw his natural father again. Appellant quit high school after the tenth grade, although at some point he did obtain his GED. At fifteen he left home, living variously in New Orleans, off and on with his grandparents in Port Neches, and for a time at a boys' ranch near Fort Worth. For three months he was in the army; the circumstances of his discharge were not disclosed. Appellant married Tina in early 1986, and they moved from place to place in east Texas, working various menial jobs. After Tina's mother took her back to Chicago, appellant followed in an attempt to retrieve her. He only succeeded in getting himself roughed up by members of her family.

Appellant specifically requested three instructions that would have authorized the jury to answer either one or the other, or both, of the special issues "no" should it "find any aspect of the Defendant's character or record or any of the circumstances of

the offense as factors which mitigate against the imposition of the death penalty." The trial court denied all three instructions, and gave no other instruction sufficient to allow the jury to consider and effectuate any evidence of mitigating value that, though outside the scope of special issues, could nevertheless persuade a jury in its "reasoned moral response" to assess a punishment of less than death. *Penry v. Lynaugh,* 492 U.S. at 322, 109 S.Ct. at 2948, 106 L.Ed.2d at 280. In any event, appellant need not have objected to preserve *Penry* error. See *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991) (Campbell, J. concurring).

In proving a volatile, and at one time abusive family history, and an unremittingly itinerant childhood and adolescence, appellant presented what may reasonably be construed as substantive evidence of "a disadvantaged background," and of at least "emotional," if not "mental problems." *Id.,* U.S. at 319, S.Ct. at 2947, L.Ed.2d at 278, quoting *California v. Brown,* 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring). Although that evidence may be relevant to answering both the first and second special issues, I believe it to have potentially mitigating impact beyond those parameters.[1] Whether or not we personally share the *Penry* Court's perception of a "belief, long held by society," that such defendants "may be less culpable than defendants who have no such excuse[,]" *id.,* we cannot say a juror would not consider such evidence instructive, notwithstanding affirmative answers to the statutory special issues, as tending in a broader sense to "ameliorate fault." *Gribble v. State,* supra, at 76. Where evidence of this kind is adduced, the Eighth Amendment requires that the jury be empowered both to consider and respond to it.

Moreover, although not a minor, appellant was only nineteen years old. Notwithstanding *Graham v. Collins,* 506 U.S. ——, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), jurors are entitled to believe that age has a

bearing on moral culpability that transcends the particular factual questions of deliberateness, provocation and future dangerousness. See *Elliott v. State,* 858 S.W.2d 478 (Tex.Cr.App.1993) (Clinton, dissenting). Even a juror who believes beyond a reasonable doubt that a capital defendant killed deliberately and without provocation, and will likely continue to commit violent crimes, may yet judge his youth to be a valid reason to assess a penalty less than death.

In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the Supreme Court invalidated the death sentence of a 21 year old defendant. Under the Ohio statute then governing capital sentencing, the trial judge was to impose a sentence of death unless he found one of three statutorily defined mitigating circumstances, *viz:* 1) that the deceased "induced or facilitated" the offense, 2) that the accused acted under "duress, coercion or strong provocation[;]" or 3) that the accused's conduct was a product of his "psychosis or mental deficiency[.]" *Id.,* U.S. at 607, S.Ct. at 2966, L.Ed.2d at 991–92. Although such factors as Lockett's age and criminal record could be considered in the determination whether any of the statutory mitigating circumstances existed, they could not be regarded as justifications in their own right for a sentence less than death. Nor could factors such as the accused's relatively minor role in the events leading up to the murder, or absence of an intent to kill on her part. A plurality of the Supreme Court held that this limitation of the range of mitigating circumstances was incompatible with its recent Eighth Amendment jurisprudence, most notably *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In a companion case to *Lockett, Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the same plurality overturned the death penalty of a defendant who had been sixteen years old at the time of his offense.

1. Indeed, relative to the issue of future dangerousness, appellant's evidence may have only aggravating value; that is, it may tend only to persuade a jury to answer the second special issue "yes." See *Burns v. State,* 761 S.W.2d 353, at 355, n. 3 (Tex.Cr.App.1988).

In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Supreme Court adopted the holding of *Lockett.* The Oklahoma capital sentencing statute provided for consideration of "any mitigating circumstances," and the trial judge did take Eddings' age, 16 years old, into account in assessing the punishment. Thus the Supreme Court observed approvingly: "The trial judge recognized that youth must be considered a relevant mitigating factor." 455 U.S. at 115, 102 S.Ct. at 877, 71 L.Ed.2d at 11. Because the trial judge declined to consider the troubled circumstances of Eddings' upbringing, however, his death sentence was also overturned, on authority of *Lockett.*

*Lockett, Bell* and *Eddings,* all supra, support the proposition that youth necessarily has Eighth Amendment relevance as mitigating evidence, quite apart from whatever bearing it may have on Article 37.071, V.A.C.C.P., special issues.

Especially in combination with evidence of his "turbulent family history," *Eddings v. Oklahoma,* supra, U.S. at 115, 102 S.Ct. at 877, 71 L.Ed.2d at 11, including his own broken marriage, the fact of his relative youth takes on significant mitigating potential which cannot be fully encompassed within the statutory special issues. The instructions requested by appellant were sufficient to alert the trial court that his jury lacked a mechanism for expressing its "reasoned moral response" to that evidence in its punishment deliberations. Of course:

"[t]his is not to say that the jury must assess a penalty less than death for all defendants who offer mitigating evidence at trial. But jurors may not be precluded from doing so by omission from the court's charge of a means to

express their will. *Penry v. Lynaugh,* supra."

*Gribble v. State,* supra, 76. Because jurors in appellant's cause were so precluded, we should sustain his fourth point of error.

Because the majority does not, I respectfully dissent.[2]

**2.** The majority correctly identifies appellant's sixth point of error as raising the contention that his initial detention outside the house in Winnfield, Louisiana, after law officers had surrounded the house and "advised" the occupants to come out, amounted to more than a mere "Terry" stop, and thus required probable cause. Slip op. at 710. Inexplicably, the majority then proceeds to answer a different question altogether, *viz:* whether the officers had a reasonable suspicion to justify a "Terry" stop at the

time they initially surrounded the house. The majority concludes they did, and that their reasonable suspicion ripened into probable cause after appellant came outside and produced a Texas auto registration receipt in the name of the deceased, but claimed the car belonged to his sister. Slip op. at 711–712. With all due respect, and without offering an opinion on the ultimate merits of appellant's actual claim, I would simply point out that the majority's analysis is unresponsive.