**Opinion issued October 3, 2013**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-12-00919-CR**

———————————

**CALVIN RAY RANDLE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1153730**

**MEMORANDUM OPINION**

A jury convicted Calvin Ray Randle of capital murder.[1] The trial court assessed punishment at life in prison. In one issue on appeal, Randle contends that

---

[1]      *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2011).

the trial court erred in refusing his request to offer impeachment evidence during cross-examination of a police detective regarding the criminal history of one of the State's witnesses. We affirm the trial court's judgment.

## Background

Randle's murder conviction arises out of his role as a getaway driver in an armed robbery gone awry. Wearing ski masks, Randle's nephew, Lisbon Wilkins, and another unidentified man entered a Fiesta grocery store in Houston, Texas. Wilkins carried a pistol; the other man wielded a shotgun. While the man with the shotgun guarded the front door, Wilkins ordered everyone in the Fiesta to get down on the floor, grabbed a cashier, and held the pistol to the cashier's head as he walked him toward Fiesta's courtesy booth, which contained more than $25,000 in cash. Wilkins demanded admittance into the courtesy booth, but his efforts were unsuccessful. He then fired his pistol at the ceiling.

An armed security guard appeared and commanded Wilkins to release the hostage. Wilkins released the cashier and then shot at the security guard. The security guard fired back, striking Wilkins in his leg and chest. At the same time, the shotgun-wielding man fired at the security guard, mortally wounding a Fiesta grocery shopper.

The two robbers fled the scene in a stolen Dodge Caravan parked outside of the Fiesta; Wilkins drove the car two blocks before crashing into a ditch. Two witnesses heard the crash, and saw, less than one minute, later a Lincoln Towncar

2

pull up next to it. The Towncar appeared "similar" to photographs of the Lincoln Towncar owned by Randle. One of these witnesses also testified that the injured Wilkins was helped into the backseat of the Lincoln Towncar, the man with the shotgun got into the car with him, and the driver of the Lincoln Towncar drove them away.

Police officers later discovered Wilkins's body in the middle of a street in north Houston. They contacted his family, who gave them information about Randle. The police went to Randle's house to question him about his possible connection to the Fiesta robbery. Randle told the officers he had eaten dinner with Wilkins earlier that evening and then drove home, where he remained all night. Police observed blood on the backseat of Randle's Lincoln Towncar. Randle consented to a police search of his car; the blood in the backseat was later matched to Wilkins's. DNA testing also demonstrated that Wilkins was in both the van initially used to get away and in Randle's Lincoln Towncar.

Joseph Moses, a friend of Randle's, was arrested about three months later for possession of less than one gram of cocaine. Seeking leniency, Moses told police that Randle had admitted to being the getaway driver for the Fiesta robbery. Moses also said that he had seen various items of personal property inside Randle's house that did not belong to Randle. According to Moses, Randle confessed to taking the items from the same stolen Caravan that the two robbers used to flee

3

from the Fiesta. Moses also claimed that Randle admitted to dumping Wilkins's body and the robbery weapons. Based on Moses's statement, police obtained a warrant to search Randle's home, where they found numerous items taken from the stolen Caravan. Telephone records also demonstrated a number of phone calls between Wilkins and Randle on the date of the robbery.

A grand jury indicted Randle for capital murder. A jury found him guilty.

### Attempted Impeachment of Sergeant Odom

Houston Police Sergeant R. Odom served as the lead investigator in the Fiesta robbery case and testified for the State. On direct examination, Odom explained that he spoke with Moses while Moses was serving time in the Harris County Jail for a 2008 cocaine possession offense. According to Odom, Moses provided valuable information to Odom about Randle's involvement with the Fiesta robbery which, in turn, led to the issuance of a search and arrest warrant for Randle. Odom informed Moses that he could not make any deals or promise leniency in exchange for this information. But, Odom did request that the prosecutor in Moses's case allow Moses to serve out his sentence in county, rather than state, jail. Moses served his nine-month cocaine possession sentence in the Harris County Jail.

During Randle's trial, the State asked Odom these questions regarding whether Moses had been arrested since his release from the Harris County Jail:

4

Q. [State Counsel:] Are you aware of any charges that [Moses is] facing or that [Moses is] getting any deal for to testify?

A. [Odom:] None that I'm aware of.

Q. Since Mr. Moses served his time on that case, has he even been arrested —

A. Not that I'm aware of.

Q. — on any other offense?

A. No.

As a result of this testimony, Randle requested permission to introduce impeachment evidence of Moses's "entire criminal history." Randle argued that Odom's testimony created a false impression with the jury, thereby opening the door to the introduction of otherwise inadmissible evidence. The evidence Randle sought to introduce consisted of a printout from the Harris County Justice Information Management System (JIMS) booking database purporting to show Moses's prior arrests in Harris County from 1976 to 2005. Specifically, the JIMS printout shows that Moses was arrested for, but ultimately acquitted of, murder in 1976. Additionally, it listed Moses's numerous traffic-related arrests (e.g., failure to maintain car insurance and driving with a suspended license), a 1989 burglary arrest, multiple drug arrests from the 1990s, and the 2008 cocaine possession arrest that motivated Moses to be forthcoming with law-enforcement officials about the Fiesta robbery.

The State timely objected to Randle's request on the ground that neither the State's questions nor Odom's answers opened the door to impeachment evidence concerning Moses's criminal record before his 2008 arrest for cocaine possession. The trial court agreed and rejected Randle's "opened door" or "false impression" theory. Randle appeals that ruling.

## Standard of Review

We review a trial court's evidentiary ruling for an abuse of discretion. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd). Unless the trial judge's decision was outside the "zone of reasonable disagreement," we will uphold the ruling. *Oprean*, 201 S.W.3d at 726; *Walker*, 321 S.W.3d at 22.

## Impeachment Evidence

In his sole issue on appeal, Randle contends that the trial court abused its discretion by excluding impeachment evidence of Moses's criminal history. Randle argues that Odom's testimony about Moses left the jury with the false impression that Moses was a law abiding citizen who did not have a criminal history except for his 2008 cocaine possession conviction. Randle further argues that the State's direct examination of Odom "opened the door" to evidence of Moses's full criminal history.

The State responds that there was no false impression to clear up because "[b]y stating that [Odom] was unaware of Moses being arrested during a four-and-a-half year period, Odom conveyed to the jury nothing more than that he was unaware of Moses being arrested during a four-and-a-half year period." Therefore, the trial court did not err by excluding evidence of Moses's pre-2008 criminal history.

When attacking the credibility of a witness, evidence of prior criminal convictions can be admitted only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the evidence's probative value outweighs its prejudicial effect. *See Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993); TEX. R. EVID. 609(a). An exception to rule 609 applies, however, when the testimony of a witness on direct examination "opens the door" or leaves a false impression with the jury about the extent of the witness's prior arrests, convictions, charges, or trouble with the police. *See Delk,* 855 S.W.2d at 704. Once the witness's response triggers the exception, opposing counsel may introduce what would otherwise have been inadmissible evidence about the witness's past criminal history. *See id*. at 704–05.

In analyzing whether a State's witness opened the door for the defendant to correct a false impression, the Court of Criminal Appeals in *Delk* examined whether the statement was responsive to the question asked and how broadly the

question was asked, given the major substantive issues in the case. *Id*. at 704–5; *see also Hammett v. State*, 713 S.W.2d 102, 106–07 (Tex. Crim. App. 1986) (holding extent to which question "opened the door" depends on question asked and statement that witness had one arrest does not leave false impression that witness had no other arrests or open door to evidence of other arrests). Thus, a witness is considered to have "opened the door" to evidence of his prior criminal history only when he does "more than just imply that he abides by the law—he must in some way convey the impression that he has never committed a crime." *Theus v. State*, 845 S.W.2d 874, 879 (Tex. Crim. App. 1992). Likewise, a witness who testifies voluntarily or non-responsively about extraneous matters is subject to cross-examination to correct a false impression presented by the answer. *See Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

The thrust of Randle's argument is that Odom's testimony left the jury with a false impression that Moses had only one run-in with the police—i.e., his 2008 cocaine possession arrest. In accordance with *Delk*, we examine the context and responsiveness of Odom's answer. The prosecutor began his question with "[s]ince Mr. Moses served his time on that case, has he even been arrested —." Odom interrupted the prosecutor and answered "[n]ot that I'm aware of" before the prosecutor finished asking his question. Even though Odom answered prematurely,

8

his answer was responsive. Additionally, the prosecutor immediately concluded his interrupted question with the phrase "on any other offense" so that the complete question would be fully heard by the jury and reflected in the record. We conclude that this testimony did not open the door to impeach Moses regarding his entire criminal history, including traffic offenses and arrests that did not result in a conviction.

Randle also argues that the prosecutor's direct examination of Odom "left the jury with the impression that the sole drug conviction testified to by Moses . . . was the extent of [Moses's] criminal history." The prosecutor's question was framed narrowly to inquire whether Moses had been arrested during a particular period of time—i.e., the four-and-a-half year period *after* Moses's 2008 arrest for cocaine possession and before his September 2012 arrest just before Randle's trial. The focus of the question did not inquire into whether Moses had *ever* been arrested. The question simply inquired about the four-and-a-half year period following Moses's arrest for possession. Nothing in the record indicates that Odom's answer was describing a broader time period.

Odom's answer to the prosecutor's direct, specific question was itself both direct and specific. He, therefore, answered well within the parameters of the State's narrow question. Furthermore, Odom's answer did not suggest that Moses's

2008 arrest was his first, or that Moses was a law abiding citizen; nor did Odom in any way imply Moses had such a reputation. *Theus*, 845 S.W.2d at 879.

The trial court could have reasonably concluded that Odom's testimony did not leave the jury with a false impression about Moses, much less open the door to cross-examination about Moses's "entire criminal history."[2] Accordingly, the trial court did not err in excluding Randle's impeachment evidence.

For these reasons, we overrule Randle's single issue.

**Conclusion**

We affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[2] Even if we were to determine that the trial court erred by refusing Randle's request to offer impeachment evidence on cross-examination of Odom, that error, if any, would be harmless beyond a reasonable doubt. This is so because the impact of informing the jury of Moses's other criminal history would have been nothing more than cumulative evidence of his bad character, which was already before the jury. For example, the jury knew that Moses was a cocaine user. The jury also was aware that Moses withheld important information from law enforcement about an unsolved capital murder case until it was in *his* best interest to disclose it. Thus, if it was error to deny Randle's right to cross-examine Odom about Moses's arrest record, such error was insignificant and likely had no impact on Randle's trial.