William MITCHELL, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–96–00643–CR.

Court of Appeals of Texas, San Antonio.

April 22, 1998.

Discretionary Review Granted Sept. 16, 1998.

Michael Stephen Raign, San Antonio, for appellant.

James Scott Sullivan, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Before RICKHOFF, LÓPEZ and DUNCAN, JJ.

## OPINION

RICKHOFF, Justice.

William Mitchell, a borderline mentally retarded defendant, was sentenced to 80 years in prison for aggravated robbery with a deadly weapon after he appeared before the jury in the same distinctive T-shirt worn by the suspect two years earlier during the offense. The T-shirt was a focal point of the trial and the videotape which recorded the offense.

In five points of error Mitchell argues that the trial court erred in not charging the jury with a definition of "reasonable doubt" at the punishment phase of his trial, that the identification of Mitchell was improperly suggestive, that the trial court erroneously allowed

improper bolstering of an impeached witness, that the evidence was factually insufficient to support a deadly weapon finding, and that his trial counsel was ineffective.

We reverse and remand and direct the trial court to appoint new counsel. Counsel's single act of failing to object before jurors saw the defendant in the distinctive outfit worn during the offense, and when arrested, under these facts, constitutes ineffective assistance of counsel. We decline to subject this to a harm analysis because, although the evidence was powerful, the error implicates Mitchell's fundamental entitlement to a fair trial.

## FACTS

On July 8, 1994, Leigh Ann Russell was working the midnight shift in a Stop–n–Go near Randolph Air Force Base. About 3 a.m. a man she later identified as William Mitchell came in the store. He put some items on the counter, then went to the back of the store and browsed while another customer came in and left. After that customer left, the man brought a 12–pack of sodas to the counter. Russell testified at trial:

A. I rang him up. I totaled him up. That is when he showed me the gun.

Q. Can you show the jury what gesture, if any, he used when he did that?

A. Just raised his shirt, during the whole time he kept going for the gun, making me totally nervous and scared.

Q. Tell the jury exactly where was the gun.

A. In the waistband of his pants.

Q. Can you describe it?

A. It was a light colored—you can tell it was a wooden handle; part of the barrel, you could see, was silver.

Q. Did he ever take that gun out of his waistband and point it at you?

A. Thank God, no.

Q. Did it appear to you to be a toy gun?

A. No, it didn't. It was very real.

Q. Where were you standing when he first showed you the gun?

A. I was behind the register.

Q. What did you do when he did that?

A. I got so scared I couldn't work the keys on the register. I kept messing up before I got the drawer open.

Q. Did he say something at this time?

A. I think he said something like, "See, I have got a gun. Give me your money," or something like that.

* * *

Q. While you were [taking money out of the register], what was he doing?

A. He kept reaching for his gun.

Q. Okay. When you say that, what kind of movement did he make? Describe that for the jury.

A. He was reaching into his waistband and shirt, kept lifting up his shirt like he was going for his gun.

Mitchell was arrested the next day wearing a T-shirt identical to the one worn by the robbery suspect captured on the store's video camera. The investigating detective described it as "a blue colored T. shirt (sic) with writing on it, I believe the writing said Cameron Elementary Scotties and a picture of a Scottish terrier dog." Mitchell was photographed in this T-shirt; this photograph was placed in a photo line-up which the clerk used to identify Mitchell. On the photograph is the hand-written notation, "Same clothes on as he had on in video."

### IDENTIFICATION AT TRIAL

In his second point of error Mitchell contends his identification by one witness was unnecessarily suggestive and tainted. Mitchell moved to suppress the photo identification; the trial court held a hearing and denied the motion.

 When analyzing the admissibility of an in-court identification, the reviewing court uses a two-step analysis: 1) Was the photo display impermissibly suggestive? 2) If it was suggestive, the court looks to the totality of the circumstances to determine if the suggestive procedure gave rise to a "very substantial likelihood of irreparable misidentification." *Delk v. State,* 855 S.W.2d 700, 706 (Tex.Crim.App.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993). Among the factors to be considered are 1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the witness's level of certainty; 5) the time between the crime and the confrontation. *Id.*

Mitchell's primary complaint revolves around two aspects of the photo used in identifying Mitchell: 1) in the photo line-up in question, he was apparently wearing the same shirt worn at the time of the robbery; 2) written on the photo was the notation, "Same clothes on as he had on in video." However, the detective who showed the clerk the photos testified that a manila overlay was used which cut down on the area of the photo visible until a victim could see "a little maybe of the top of their shirt and their facial features, hair and such as that." Unfortunately, Mitchell's trial counsel did not preserve the actual photo line-up for our review.

■ In considering the *Delk* factors, we note first that the videotape, and the witness's testimony, shows that the suspect was in the store for almost seven minutes. The suspect brought items to the register and conversed with the cashier who later identified him. The cashier said that while she was distracted by the gun during the robbery, she was watching the suspect the rest of the time because his actions made her suspicious. When showed the photo line-up the day after the robbery, the cashier picked out Mitchell immediately.

In light of this evidence, we find the clerk's identification was not so tainted as to be inadmissible. Mitchell's second point of error is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his fifth point of error Mitchell contends he was denied effective assistance of counsel. The test for ineffective assistance of counsel under the state and federal constitutions are the same, *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex.Crim.App.1986), and so we consider them together.

■ The criteria for assessing ineffective assistance of counsel has been set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test focuses on reasonableness, measuring the assistance received against the prevailing norms of the legal profession. *Id.* at 690, 104 S.Ct. at 2066. Counsel is presumed to have rendered adequate assistance, and it is incumbent on the defendant to identify those acts or omissions which do not amount to reasonable professional judgment and are outside the "range of professionally competent assistance." *Id.* To show prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The key question becomes whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *See Castoreno v. State*, 932 S.W.2d 597, 604

(Tex.App.—San Antonio 1996, pet. ref'd) citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. The constitutional right to counsel, whether appointed or retained, does not mean errorless counsel. *Castoreno*, 932 S.W.2d at 604.

Here appellate counsel singles out seven particular shortcomings of trial counsel: 1) failure to preserve error at the jury selection process; 2) failure to preserve error on the question of the photo identification; 3) failure to preserve the photo line-up itself; 4) failure to ask the State for advance notice of its intent to use prior convictions or previous crimes before trial; 5) omission of the definition of "reasonable doubt" in the charge; 6) opening the door to testimony about Mitchell's prior convictions by counsel's own questions; 7) failure to object to the State's jury argument about the effect of parole laws on Mitchell.

■ While the effectiveness of counsel is ordinarily gauged by the totality of the representation, a single error, if sufficiently egregious, can constitute ineffective assistance. *Ex parte Felton*, 815 S.W.2d 733 (Tex.Crim.App.1991); *May v. State*, 722 S.W.2d 699 (Tex.Crim.App.1984) (single error of failure to have defendant's petition for probation sworn sufficient to constitute ineffective assistance). Here we believe we are confronted with an error of this magnitude.

Just before closing argument, the following exchange took place:

[DEFENSE COUNSEL]: Something has been brought to my attention. I didn't realize until just now that during voir dire Mr. Mitchell was actually wearing those clothes there. He was told by the jail people to put them on and he was brought over here in those clothes. During the entire voir dire he was wearing the exact outfit he is alleged to have been wearing during the commission of the offense. I move for a mistrial because the jurors saw him, they were tainted by seeing him in that outfit.

THE COURT: That is denied. Anything else?

[PROSECUTOR]: For the record, he only had those clothes on during the judge's

opening remarks, not during the entire voir dire.

THE COURT: It doesn't matter, anyway. That is the only clothes he had. We can't bring him over in a jail outfit. Those are his clothes.

In our view, this exchange suggests a grievous lack of preparation by Mitchell's counsel. Counsel was either not familiar enough with the videotape which provided the most damning evidence against Mitchell, or was insufficiently in touch with Mitchell, or both. Indeed, bringing him to court in jail garb would be less incriminating than displaying him to the jury panel in the distinctive T-shirt captured on the videotape.

■ A more damning inference to be drawn from the record is that this defendant was abandoned by the judicial system. At least one prosecutor suggested knowledge of this miscarriage of justice and yet said nothing. A prosecutor is an officer of the court and has the duty to see that justice is done.

While the state argues that identification was not an issue in this case, we disagree. Though the identity evidence was strong, the record shows defense counsel contested identity up until the very point when the mortifying discovery was made, just before closing argument. She suggested to witnesses on cross-examination that there were certainly more than one of these shirts and that anyone (presumably her client) could have found this discarded shirt and worn it. Shorn of the ability to contest identity, she was reduced in closing argument to arguing that the evidence did not show beyond a reasonable doubt that Mitchell used a gun during the robbery.

This oversight challenges the integrity of our jury system. A defendant in our criminal justice system is entitled to put the state to its proof. TEX.R. DISCIPLINARY P. 3.01 cmt. 3, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A–1 (Vernon Supp. 1998). Mitchell's attorney thwarted his attempt to put the state to its proof before it ever got off the ground.

If ever there was a defendant who needed representation, it was Mitchell. The record reflects that Mitchell had a competency trial prior to this trial on the merits. Two psychiatrists examined him and presented reports; one found him competent and the other found him incompetent. The various diagnoses included dysthymia (neurotic depression), atypical psychosis (not in touch with reality) mixed personality disorder with antisocial and schizoid traits, and an inability to communicate with his attorney. They further testified that his tested IQ of about 68 placed him in the upper range of mental retardation. Several suicide attempts were related and after the competency hearing the court told the jury, "This individual has been in the maximum security state hospital for the last 19 years."[1] Further, Mitchell's behavior in a separate offense, *robbing* the neighborhood store where he and his family were known to the victim, demonstrates his profound lack of judgment.

The fact that counsel's objection and motion for mistrial was untimely and did not preserve error simply underscores our conclusion that counsel did not render the effective assistance Mitchell was entitled to and so desperately required. Counsel was aware of all of Mitchell's disabilities from representing him at the competency trial and when he elected to decline a plea bargain. Due to Mitchell's decision errors in the face of strong evidence, counsel was challenged to create a defense.

Nevertheless, the record shows that on the morning of trial the T-shirt was removed from storage, where it had been since he had been arrested two years before, and it was offered to him. One would think he met his defense counsel in that T-shirt before the jurors were called. The time for counsel to object was before jury selection began. One can only wonder what the jurors thought when they first saw the defendant in this shirt, then learned it was worn during the offense and arrest, as if Mitchell could never appear mufti. They later imposed an eighty-year sentence on Mitchell, perhaps because

---

1. Mitchell was 27 at the time of the examining trial. This leads us to believe the trial court meant to say "months," not "years."

they felt insulted that they invested their time in this case without purpose. We believe this error was one which so permeated the trial that it was not just the guilt-innocence phase of the trial that was impacted.

The dissent argues no harm can be shown in bringing Mitchell before the jury panel on voir dire in the perpetrator's clothes. However, we decline to apply a harm analysis because what is at issue is a cornerstone of our adversarial system of justice.

The Supreme Court has held that "courts must be alert to factors that may undermine the fairness of the fact-finding process." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692–1693, 48 L.Ed.2d 126 (1976). The probability of deleterious effects on fundamental rights, such as the presumption of innocence which every defendant is entitled to, calls for close judicial scrutiny. *Id.*

We believe our situation is analogous to compelling defendant to stand trial in a jail uniform. Such compulsion creates an unacceptable risk of other, impermissible factors coming into play, which could infringe on "the presumption so basic to the adversary system." *Id.* at 504–505, 96 S.Ct. at 1693–1694; *see also Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (permitting sheriff's deputies who were witnesses for the prosecution to escort jury presented a similar unacceptable risk). Moreover, the Texas Court of Criminal Appeals has held that compelling a defendant to stand trial in prison clothing is reversible error which requires no harm analysis. *Ephraim v. State*, 471 S.W.2d 798 (Tex.Crim. App.1971). We believe a similar, if not identical, interest in the proper functioning of the adversary system is implicated.

We believe our situation more egregious than compelling a defendant to stand trial in a prison uniform. We note that at the time of *Williams*, in some jurisdictions it was a fairly common practice, and sometimes a tactic employed by defendants to win sympathy. *Williams*, 425 U.S. at 507, 96 S.Ct. at 1694 (citing cases). But no stretch of the imagination can paint Mitchell's appearance in these clothes as trial strategy.

We find that trial counsel's failure to prevent Mitchell from appearing before the jury panel in the clothes worn by the perpetrator in the videotape which recorded the crime permeated the entire proceeding and rendered counsel's assistance ineffective. We therefore find Mitchell's right to counsel guaranteed by the Sixth Amendment of the Constitution was violated. Mitchell's fifth point of error is sustained. Because of this disposition, we decline to reach Mitchell's other points of error.

We reverse the finding of the trial court and remand this cause to the trial court for new trial. Additionally, we direct the trial court to appoint new trial counsel.

DUNCAN, J., dissenting opinion.

DUNCAN, Justice, dissenting.

Mitchell is not entitled to a reversal of the judgment on the ground of ineffective assistance of counsel because a "preponderance of the evidence" in the record does not establish " 'there is a reasonable probability that the result of the trial would have been different absent the deficient conduct.' " *Patrick v. State*, 906 S.W.2d 481, 495 (Tex.Crim.App. 1995), *cert. denied*, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996) (quoting *Washington v. State*, 771 S.W.2d 537, 545 (Tex. Crim.App.), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3229, 106 L.Ed.2d 578 (1989)). To the contrary, a preponderance of the evidence, including Russell's immediate identification of Mitchell and the seven-minute videotape of the robbery, establishes the contrary. I therefore respectfully dissent.