IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-71,017-01






EX PARTE LOUIS IVAN AVILES, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. 971688-A IN THE 339TH DISTRICT COURT


FROM HARRIS COUNTY






 Cochran, J., filed a concurring statement.


 I join the Court's Order denying applicant relief. I write separately to explain why I
agree that the record does not support the habeas judge's ultimate factual findings and
conclusions of law. (1) The record comes to us in a peculiar posture. The habeas judge initially
signed the State's proposed findings of fact and conclusions of law and agreed with the
State's recommendation that this Court deny relief. Then, after applicant's counsel filed
objections to those findings, the habeas judge did a 180-degree about-face and signed 
applicant's findings of fact and conclusions of law. Not surprisingly, they were the polar
opposite of the State's factual findings. Such a complete flip-flop does not inspire
confidence in either set of findings. Thus, I must set aside both sets of signed findings and
independently conduct my own review of the record as a factfinder.

I.


 Applicant was charged with sexual assault of a child occurring on or about December
12, 2003. A jury convicted him of the offense, and the trial judge sentenced him to twenty-five years' imprisonment. According to the direct appeal opinion, (2) the fourteen-year-old
complainant testified that applicant's twelve-year-old nephew, a playmate of hers, saw her
talking on the pay phone in the courtyard of their apartment complex one evening. He asked
her to come by his apartment when she was finished. When she came over to his apartment,
applicant tricked her into walking to the back of the apartment by telling her that his nephew
was in a bedroom. The nephew was not in the apartment. Applicant cornered her and
"forcefully" raped her while she cried and asked him to stop. (3) 

 The trial record shows that the child was afraid and went home in a daze, but by the
next day she had recovered enough to tell an older friend, Gladys, about the rape. Gladys and
her sister Veronica went with the child to tell her mother about the rape. Her mother called
the police. While they were waiting for the police to arrive, applicant knocked on their door
and said that the complainant was lying and he hadn't done anything to her. The child's
mother told applicant to leave because she had already called the police. 

 Dr. John Patlan conducted a sex-abuse examination that afternoon. He testified that
he found "small tears in the complainant's hymen and vaginal tissues, redness and
inflammation in that area, and a relatively fresh scratch on her upper left chest (the
complainant had already testified that the injury happened as applicant held her down)." (4) Dr.
Patlan testified that the child's injuries "appeared to be signs of some forceful penetration." (5) 

 The investigating officer testified that, based on the medical records that he had
reviewed, the complainant's injuries were consistent with a sexual assault. (6) He also testified
that, "[b]ecause of experience we had with the Defendant," he and his fellow arresting officer
agreed that "it would probably be in our best interest not to interview the Defendant." (7)

 In the defense case, applicant's mother testified that she did not like the complainant
coming over to her apartment to use the telephone and open the refrigerator. She "ran her
off" two times. Applicant's nephew testified that he sometimes played with the complainant,
but that he never saw applicant alone with her in the apartment. Applicant's younger brother
testified that he had once dated the complainant, but they broke up after a month or two
because his mother didn't like her.

 Applicant testified and immediately denied committing the offense. Applicant then
filled in his background: he had quit school after junior high, joined the Puro Vato Loco gang
(also known as the "Crazy Guys" or "Crazy People"), and ended up getting in trouble with
the law. He went to the Youth Village, TYC, and TDC. But after he got out of TDC in
about 2001, he had a "wake-up call," settled down, and had a baby with his girlfriend. He
co-owned an electronics shop and supported his baby girl and girlfriend. Applicant testified
that on the evening of December 12th, he and his nephew were alone in the apartment
because his mother had gone to a birthday party. Applicant's girlfriend and baby were in
Mexico for a week. That evening the complainant had come over and played darts with his
nephew for a few minutes, they wrestled, and the child went back outside. She came back
again later and tried to use the phone, but applicant told her to leave, and she did. That was
it. Applicant didn't know why the child would falsely accuse him.

 On cross-examination, the prosecutor established that applicant was wrong about
getting out of TDC in 2001. He was released in 2002, and he was still identifying himself
as a gang member to police in 2003 during a traffic stop. When the prosecutor asked him if
he remembered "sticking [his] sexual organ" in the complainant, applicant said, "I don't
remember." The prosecutor promptly passed the witness. 

 Applicant's attorney gave a credible closing argument urging the jury to find
reasonable doubt based upon perceived inconsistencies in the testimony and upon the defense
case. The prosecutor argued that there was ample evidence, especially the physical evidence
of forceful penetration, that the child had been raped by applicant. The jury convicted him. 
The court of appeals affirmed his conviction and sentence. Two years later, applicant filed
an application for a writ of habeas corpus, alleging ineffective assistance of counsel.

II.


 In his supplemental writ application, (8) applicant alleges that his trial counsel provided
constitutionally ineffective assistance in various ways:

 "Trial counsel elicited otherwise inadmissible and inherently prejudicial
evidence that applicant dropped out of high school, joined a gang, was sent to
TYC after his juvenile probation was revoked";


 "Trial counsel failed to ask proper commitment questions re whether jurors
would automatically disbelieve a witness who was an ex-convict and afford
him the presumption of innocence";


 "Trial counsel failed to file a pre-trial motion in limine and/or object to the use
of the term 'victim' to describe the complainant";


 "Trial counsel failed to request a proper oral limiting instruction as well as a
proper limiting instruction in the jury charge re the jury's consideration of the
applicant's prior bad acts"; 

 

 "Trial counsel failed to object to inadmissible hearsay testimony from Graciela
Garcia that the complainant told Veronica she had been raped";


 "Trial counsel failed to object and/or ask for an instruction to disregard when
HPD Off. Matthew Dexter testified that the decision was made not to
interview the applicant 'because of experience [sic] we had with' him that
suggested the applicant had engaged in inadmissible and inherently prejudicial
prior bad acts"; and


 "Trial counsel failed to correct the applicant's direct testimony when he misled
jurors as to his release date from prison, the date he was last involved with
gangs and failed to correct the applicant when he said on cross-examination he
could not remember if he sexually assaulted the complainant."


 The habeas court held an evidentiary hearing at which the only witness was
applicant's trial counsel. He testified that applicant had originally retained Hector Sanchez
as his attorney, but Mr. Sanchez was primarily an immigration attorney, so he retained trial
counsel, a friend of Mr. Sanchez's from law school, to assist him. Trial counsel had handled
over one thousand criminal cases during his twenty years as a defense lawyer. He had about
one hundred first-chair jury trials and he had tried about five sexual assault of a child cases. 

A. Counsel's Affidavit.

 In his 2008 written affidavit, trial counsel explained that he and Mr. Sanchez had
strongly recommended that applicant not testify. But applicant "had determined that he
wanted to testify. I advised him that neither I nor co-counsel believed it was in his best
interest to testify, and in fact thought it would be detrimental to his defense. He insisted. .
. . [Applicant] was determined that his case would be best tried by attempting to malign the
character of the complainant, and then to testify regarding the fact that he was non-violent
and not of a character that could do something like sexually assault a child." 

 Counsel explained that putting on a "good character" defense had serious pitfalls
because it was likely that the trial judge would allow the State to cross-examine applicant
with his gang membership-something that would not otherwise be admissible. Applicant,
however, insisted on testifying and agreed that it would therefore be best to bring out his
prior felony record and gang membership on direct examination "rather than allow the State
to bring it out in a 'surprise' fashion." Once applicant made the decision to testify, the
objective was to make him look as honest as possible, so he had to "pony up" a lot of
unflattering information. As counsel later explained, "And that's the defensive theory, that
if he testifies about stuff that's harmful to him, then maybe they'll believe him when he's
telling the other stuff, as well." It did not work out well, but, in counsel's mind, that didn't
mean that the plan was bad.

B. Counsel's Testimony.

 In August of 2010, trial counsel had lunch with habeas counsel and, after reviewing
the record and other materials, admitted that he now thought that he could have done some
things differently at trial. At the evidentiary hearing in September, trial counsel took
responsibility for his actions and failures to object. His position during the hearing was, in
essence, that he did not provide effective assistance of counsel when the case was tried five
years earlier. 

 I agree with trial counsel's original assessment that he did the best he could once
applicant made the decision to testify and shoot himself in the foot. As the prosecutor put
it, "So he puts his client on the stand. And the [applicant], in grand fashion, proceeds to pull
the trigger. Not because [defense counsel] didn't prepare him. Not because [defense
counsel] didn't know the law, but because the [applicant] insisted on lying to the jury, to the
prosecutor, to his own counsel." 

III.


 Applicant has failed to show that any of the specific instances of alleged ineffective
assistance prejudiced his defense, and, for most of those instances, applicant has not
established deficient performance by his trial counsel.

 The Sixth Amendment guarantees the right to reasonably effective assistance of
counsel in criminal cases. (9) To prove a claim of ineffective assistance, applicant must show,
by a preponderance of the evidence, (10) that (1) his counsel's representation was deficient and
fell below an objective standard of acceptable performance, (11) and (2) this deficient
performance prejudiced his defense such that a reasonable probability exists that, but for his
counsel's unprofessional errors, the result of the proceeding would have been different. (12) 
Courts indulge in a strong presumption that an attorney's actions at trial were reasonably
professional and motivated by sound trial strategy. (13) A finding of ineffectiveness cannot be
supported by second-guessing, hindsight, or "Monday morning quarterbacking" of counsel's
trial strategy or the fact that other attorneys might have pursued a different strategy. (14)

 With that general background, I turn to applicant's specific claims.

A. "Trial counsel elicited otherwise inadmissible and inherently prejudicial
evidence that applicant dropped out of high school, joined a gang, was sent to
TYC after his juvenile probation was revoked."

 Applicant asserts that his counsel's strategy of "bringing out his own uglies" at trial
was constitutionally deficient. It was not. It is a well-accepted trial strategy to take the sting
out of unflattering facts that the opponent would undoubtedly cross-examine the witness
about by bringing them out on direct examination. (15) Applicant insisted upon testifying at
trial, and he told trial counsel that he wanted the jury to know that he was a different person
now than he had been before. He wanted to testify that he had settled down, he was now a
family man with a baby and a girlfriend that's almost a wife, that he owns a shop and is a
responsible member of the community that takes care of his mother and fatherless nephew.

 Counsel warned him of the many potential pitfalls of such an approach: applicant had
a prior prison record (he had final felony convictions for both possession of cocaine and
delivery of cocaine), visible tattoos (applicant had a tear-drop tattoo underneath his right eye
and the word "Broadway" tattooed across his neck (16)). Nonetheless, applicant wanted to
present his own defense and agreed with the trial strategy of bringing out the unfavorable
information on direct examination so the prosecutor could not "surprise" him and the jury
with those facts on cross-examination.

 Counsel briefly questioned applicant about his prior gang membership and prison
record. (17) He knew that the State would be able to impeach applicant's credibility with the
prior convictions and that his gang membership and activities would be admissible to rebut
any "false impression" that applicant left on direct examination about his character for being
a law-abiding member of the community. (18) Furthermore, the evidence of applicant's prior
problems with the law and with violent conduct was a part of his defense: He, like Saul on
the road to Damascus, had a bad youth, but he had seen the errors of his ways, found
redemption, and would sin no more. This was a perfectly fine defensive strategy, and,
indeed, the State never cross-examined applicant on his two prior felony convictions
(applicant left the impression that he had been to TDC for only one unnamed felony, not two
separate felonies committed on two separate dates) or further inquired about his prior gang
activities. The problem was that applicant simply could not leave well enough alone. He had
to gild the lily and suggest that his "redemption" had occurred way back in 2001, two years
before this offense. In fact, as the prosecutor pointed out on cross-examination, he was not
released from TDCJ until 2002 and he was still describing himself to police as a gang
member in 2003. This misstatement was applicant's fault, not his attorney's. (19)

B. "Trial counsel failed to ask proper commitment questions re whether jurors
would automatically disbelieve a witness who was an ex-convict and afford him
the presumption of innocence."


 During voir dire, applicant's trial counsel informed the jury panel members that
applicant had been to the pentitentiary before, but that he was still entitled to the presumption
of innocence. He then tried to obtain a commitment from each juror that they would consider
his testimony as someone with a prior felony conviction but not automatically disbelieve him. 
At that point the prosecutor objected to an improper commitment question, and the trial judge
sustained the objection. Counsel then asked the venire whether they all agreed that the
presumption of innocence should cover applicant throughout the trial. They agreed. Applicant now asserts that trial counsel should have attempted to rephrase his original
question into a "proper" commitment question, and that counsel was constitutionally
ineffective for failing to do so. But the question posed by habeas counsel during the
evidentiary hearing-"can you look beyond this man's prior felony conviction and find him
credible if you so believe"-is more of a specific commitment question than the question that
trial counsel attempted to ask. (20) The jury must be able to impartially judge the credibility of
all witnesses without automatically disbelieving all witnesses who have a prior criminal
record. (21) Beyond that, the parties cannot commit the jurors to "look beyond" or ignore the
defendant's prior felony conviction in assessing his credibility. (22) Nor can counsel commit
the jurors to assess one specific witness's credibility-the defendant's-in a particular way.
Trial counsel was not ineffective for failing to pose the commitment question habeas counsel
thought he should. The trial judge would have the discretion to disallow that commitment
question just as she had disallowed the commitment question trial counsel asked.

C. "Trial counsel failed to file a pre-trial motion in limine and/or object to the use
of the term 'victim' to describe complainant."

 Applicant asserts that his trial counsel should have filed a motion in limine to prevent
the State from using the word "victim" in reference to a child sexual-assault complainant. 
Trial counsel testified that he should have done so and that it could harm the defense to
constantly call a child complainant the "victim." The State countered that the word "victim"
appears eleven times in the trial record. (23) Six of those times were during voir dire and were
not references to the complainant in this case, but general references to victims of sexual
offenses. According to the State, the word "victim" was used five times during trial, and
three of those were references to a police officer's training in handling hypothetical victims. 
Only two of the uses of the word "victim" during trial refer to the complainant. Applicant
does not set out the specific two instances in which the prosecutor used the term "victim" to
refer to the complainant. There is nothing in this habeas record that would indicate that those
references were anything other than inadvertent or that they would not have occurred had
trial counsel filed a motion in limine. An objection might have called more attention to the
term, thereby hurting, rather than helping, the defense. (24) While some attorneys might have
objected to the few isolated uses of the word "victim," (25) it is equally plausible that other
reasonable and conscientious attorneys would not have objected. Applicant has not shown
counsel was ineffective in failing to file such a motion or failing to object to the prosecutor's
passing references. 

D. "Trial counsel failed to request a proper oral limiting instruction as well as a
proper limiting instruction in the jury charge re the jury's consideration of the
applicant's prior bad acts." 

 Here, applicant asserts that his trial counsel was constitutionally ineffective because
he did not ask for an oral limiting instruction, to match the written instruction in the jury
charge, concerning the use of the evidence of applicant's prior felony convictions, his gang
membership, and his juvenile record. The problem is that applicant introduced this testimony
himself and he did not introduce it for any limited purpose. He testified to his "old bad ways
in the halcyon days of his youth" to juxtapose them to his current "stalwart member of the
community" persona who would never sexually assault a child. Having purposely introduced
this testimony without limitation, applicant cannot complain about his attorney's failure to
ask for an oral limiting instruction. He was not entitled to any written limiting instruction
in the jury charge, but that instruction could have been beneficial, and it certainly was not
harmful.

 E. "Trial counsel failed to object to inadmissible hearsay testimony from Graciela
Garcia that the complainant told Veronica she had been raped." 

 Applicant asserts that trial counsel should have objected when the complainant's
mother testified that her daughter's friend told her that her daughter had been raped. This
testimony was offered to explain why the complainant's mother called the police. Her
statement was admissible for this non-hearsay purpose. Trial counsel could have objected
and asked that the jury be instructed that the hearsay statement was not being offered for the
truth of the matter asserted-that the complainant had, in fact, been raped-but only to show
that the reason the mother called the police was because of that report. 

 Although the defense would have been entitled to such a limiting instruction, it is not
an ineffective strategy to forego an objection under these circumstances because the "rape"
testimony would then be repeated, along with the trial judge's instructions about that
testimony being offered not for its truth but for its effect upon the listener and in explanation
of why the witness did some further act. (26) The complainant's mother did not say that the
friend gave any additional details such as the name of the person who had raped the
complainant, where or when it had occurred, or anything else. (27) At any rate, applicant has not
shown that the failure to object and request a limiting instruction prejudiced his defense.

F. "Trial counsel failed to object and/or ask for an instruction to disregard when
HPD Off. Matthew Dexter testified that the decision was made not to interview
the applicant 'because of experience [sic] we had with' him that suggested the
applicant had engaged in inadmissible and inherently prejudicial prior bad
acts."

 Precisely this same allegation was raised and rejected on direct appeal. (28) Although one
may reassert a specific ineffective assistance of counsel claim on an application for a writ of
habeas corpus when the record on direct appeal was not sufficiently developed to decide the
merits, one cannot otherwise reassert claims that were resolved on the merits on direct
appeal. (29) In this case, the court of appeals stated that, "even if counsel's failure to object
amounted to deficient performance under the first prong of the Strickland test, we cannot find
appellant has satisfied the prejudice requirement." (30) The court noted that there was no
reasonable probability that the jury's result would have been different had trial counsel
objected to Officer Dexter's ambiguous allusion to "experience" with applicant. (31) I agree,
and applicant has not provided any further evidence in this habeas record of how that
testimony might have prejudiced him and adversely affected the jury's verdict.

G. "Trial counsel failed to correct the applicant's direct testimony when he misled
jurors as to his release date from prison. The date he was last involved with
gangs and failed to correct the applicant when he said on cross-examination he
could not remember if he sexually assaulted the complainant."


 Trial counsel was not entitled to call a recess to "woodshed" applicant between his
direct and cross-examination testimony and then correct his inaccurate direct testimony
before the State cross-examined him on that testimony. (32) And habeas counsel does not
explain how trial counsel could have rectified the situation on redirect after the State had so
effectively cross-examined applicant about his "forgetfulness." And what exactly was trial
counsel supposed to do after applicant said that he didn't remember if he had "stuck his
sexual organ" in the complainant? Even the most effective trial counsel in the world cannot
protect his client against a self-inflicted wound like that. Applicant would have been wise
to take trial counsel's original advice not to testify, but once he took the witness stand and
became a loose cannon, the best strategy may have been to stop firing the cannon before it
fell off the boat. Counsel did exactly that. He declined the offer of redirect examination. 
I do not think that his strategy was deficient. Counsel was not ineffective; applicant was.

 In sum, the record does not support the conclusion that applicant has established, by
a preponderance of the evidence, that his trial counsel provided constitutionally ineffective
assistance of counsel that so prejudiced his defense that a reasonable probability exists that,
but for counsel's unprofessional errors, the jury's verdict would have been different. Based
upon an independent review of the record, I join the Court's Order.


Filed: May 25, 2011

Do Not Publish
1. The habeas judge is not the same judge who presided over applicant's jury trial.
2. Aviles v. State, No. 14-05-00219-CR, 2006 WL 2403308 (Tex. App.-Houston [14th
Dist.] Aug. 22, 2006, pet. ref'd).
3. Id. at *3. 
4. Id. at *3.
5. Id. 
6. Id. at *2.
7. Id. at *1.
8. The supplemental writ application expands upon the ineffective-assistance claim in the
original application and adds numerous other specific allegations about trial counsel's
performance.
9. Strickland v. Washington, 466 U.S. 668, 687 (1984).
10. The applicant must establish both Strickland prongs by a preponderance of the
evidence. McFarland v. State, 845 S.W.2d 824, 843 (Tex. Crim. App. 1992).
11. Strickland, 466 U.S. at 687; see also Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim.
App. 2002).
12. Id.
13. Strickland, 466 U.S. at 689.
14. Id. ("A fair assessment of attorney performance requires that every effort be made to
eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's
challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").
15. Ex parte Napper, 322 S.W.3d 202, 218-19 (Tex. Crim. App. 2010) ("defense counsel
was not unreasonable in addressing, on direct examination, unfavorable facts that 'most likely
would have been addressed by the prosecutors on cross-examination.'").
16. The Puro Vaco Loco gang had their "stomping grounds" around Broadway Street in
Houston. Applicant also had tattoos all the way down his arms, but trial counsel had him wear a
long-sleeved shirt for trial so that they were not visible to the jury. Applicant's habeas counsel
suggested at the writ hearing that trial counsel should have had applicant wear a turtle-neck shirt
so the jury could not see his "Broadway" tattoo. Never mind that it would be quite peculiar to
wear a turtleneck in August when this trial took place. More importantly, this tactic would most
likely have backfired as the prosecutor could reasonably be expected to use a booking photo to
display both the neck and eye tattoos and argue that applicant was still trying to hide and disguise
facts about himself. 
17. Trial counsel did not elicit the fact that applicant never attended high school, that he
was on juvenile probation, or that he went to TYC. Applicant was a nonresponsive witness and
volunteered those facts.
18. Trial counsel had researched the applicable law and correctly determined that this
evidence would likely be admissible if applicant testified and said, as applicant informed his trial
counsel that he wanted to say, that he was a family man with a baby, owned a shop, and was a
responsible member of the community who took care of his mother and fatherless nephew. See
Prescott v. State, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988) ("When the accused leaves such
a false impression during his direct examination, he is commonly said to have 'opened the door'
to an inquiry by the State as to the validity of his testimony. Accordingly, the State is allowed,
during cross-examination, to do what it could not otherwise do. That is, dispel the false
impression left by the accused as to his past, a subject which is usually an irrelevant issue,
collateral to the case, and thus inadmissible."); see also Delk v. State, 855 S.W.2d 700, 704 (Tex.
Crim. App. 1993) (collecting and discussing cases).
19. Applicant's habeas counsel suggested that trial counsel should have asked for a recess
and "woodshedded" applicant to make him retract his false testimony before allowing the State
to cross-examine him. But applicant did not have a constitutional right to consult with his
attorney between direct and cross-examination. Perry v. Leake, 488 U.S. 272, 281-82 (1989)
(defendant-witness has no constitutional right to consult with his lawyer during recess while he is
testifying; "Cross-examination often depends for its effectiveness on the ability of counsel to
punch holes in a witness' testimony at just the right time, in just the right way. Permitting a
witness, including a criminal defendant, to consult with counsel after direct examination but
before cross-examination grants the witness an opportunity to regroup and regain a poise and
sense of strategy that the unaided witness would not possess. This is true even if we assume no
deceit on the part of the witness; it is simply an empirical predicate of our system of adversary
rather than inquisitorial justice that cross-examination of a witness who is uncounseled between
direct examination and cross-examination is more likely to lead to the discovery of truth than is
cross-examination of a witness who is given time to pause and consult with his attorney."). 
There is no showing that the experienced trial judge would have permitted a "woodshedding"
recess even if trial counsel had requested one.
20. Standefer v. State, 59 S.W.3d 177, 179-81 (Tex. Crim. App. 2001) ("a question is a
commitment question if one or more of the possible answers is that the prospective juror would
resolve or refrain from resolving an issue in the case on the basis of one or more facts contained
in the question"; an improper commitment question is one that seeks to commit the juror to
resolve an issue on the basis of facts when the law does not require that the juror resolve that
issue on the basis of those particular facts).
21. See Ladd v. State, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999) ("A venireman is
challengeable for cause . . . if he cannot impartially judge the credibility of witnesses. However,
this means only that jurors must be open-minded and persuadable, with no extreme or absolute
positions regarding the credibility of any witness."; venireman not challengeable for cause 
because he would tend to believe policemen and doctors more than others).
22. See Lydia v. State, 117 S.W.3d 902, 905-06 (Tex. App.-Fort Worth 2004, pet. ref'd)
(question to venire, "Do each of you feel as though you could evaluate a witness and his
testimony and decide if he's being truthful without automatically dismissing his testimony
because of some criminal history?" was a proper commitment question).
23. Applicant did not dispute the accuracy of the State's record references.
24. See, e.g., Bollinger v. State, 224 S.W.3d 768, 781 (Tex. App.-Eastland 2007, pet. ref'd)
("Counsel can be concerned that too many objections will alienate a jury or that an objection
might draw unwanted attention to a particular issue."); Young v. State, 10 S.W.3d 705, 713 (Tex.
App.-Texarkana 1999, pet. ref'd) (not deficient performance when defense attorney failed to
object because counsel may have reasonably decided not to do so to avoid drawing more
attention to the matter); Castoreno v. State, 932 S.W.2d 597, 603 (Tex. App.-San Antonio 1996,
pet. ref'd) ("It is entirely possible that counsel made a conscious decision not to object to the use
of the police report, as an objection would have drawn attention to relatively harmless
evidence."); Henderson v. State, 704 S.W.2d 536, 538 (Tex. App.-Houston [14th Dist.] 1986,
pet. ref'd) (concluding that "[f]ailing to object to every introduction of improper evidence or
questioning does not indicate that appellant's representation was ineffective. . . . Not objecting
can be a trial strategy.").
25. At the evidentiary hearing, trial counsel "fell upon his sword" and said that, in
hindsight, he now thought he should have objected to the word "victim," but trial counsel's
hindsight assessment is not determinative.
26. Poindexter v. State, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005).
27. Id. We explained that "It is true that testimony by an officer that he went to a certain
place or performed a certain act in response to generalized 'information received
' is normally not
considered hearsay because the witness should be allowed to give some explanation of his
behavior. But details of the information received are considered hearsay and are inadmissible- 
unless the officer's conduct has been challenged, for instance, as lacking probable cause."
28. Aviles v. State, No. 14-05-00219-CR, 2006 WL 2403308 at * 3 (Tex. App.- Houston
[14th Dist.] 2006, pet. ref'd).
29. Ex parte Nailor, 149 S.W.3d 125, 131 (Tex. Crim. App. 2004) ("We hold that specific
allegations of deficient attorney performance that were rejected on direct appeal are not
cognizable on habeas corpus as a part of a larger ineffective assistance of counsel claim when the
defendant does not offer additional evidence to support that specific claim of deficient
performance in the habeas proceeding.").
30. Aviles, 2006 WL 2403308 at *3.
31. Id.
32. See note 19 supra.