In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00300-CR
_____

**LARRY WAYNE DUNCAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 258th District Court**
**San Jacinto County, Texas**
**Trial Cause No. 11,485A**

**MEMORANDUM OPINION**

A jury convicted appellant Larry Wayne Duncan of failing to stop and render

aid, which resulted in death, and assessed punishment at nineteen years of

confinement. In nineteen issues, Duncan challenges the sufficiency of the evidence

and the admission of his prior convictions, complains of the admission of certain

expert opinion testimony, asserts that the failure to give warnings before taking his

recorded statement constitutes reversible error, and contends that the punishment

verdict is ambiguous because it does not state whether the jury "does" or "does not" assess a fine. We affirm the trial court's judgment.

BACKGROUND

The victim's father, Billy Scott, testified that his daughter enjoyed jogging, and he identified the route along which she usually jogged. He explained that on February 10, 2015, he saw the victim jogging at approximately 6:20 p.m. Scott testified that it was daylight and the sun was shining. At approximately 7:30 p.m., Scott learned that his daughter had been killed.

Kimila McShan, the mother of the man with whom the victim was in a romantic relationship, testified that her son Klint and the victim lived together in her home. According to McShan, the victim enjoyed running. McShan explained that the victim had several different shoes, and she wore "mix-matched socks all the time." McShan explained that on her way home on February 10, 2015, as she slowed down to turn, she saw the victim "laying in the ditch." McShan testified that she got out of her truck and yelled the victim's name, but the victim did not respond. McShan walked toward the victim and saw that there was blood on the victim's face and she was cold, so McShan called 9-1-1 and reported that someone had hit the victim and

2

she was lying dead by the road.[1] McShan explained that the victim's injuries were obvious, her shirt was "scrambled[,]" her shorts were twisted to the side, and she was only wearing one sock. According to McShan, the victim's shoes had been knocked off. McShan explained that when she reached Cleveland at approximately 6:30, it was dusk. McShan testified that when she saw the victim, it was approximately 7:30 p.m., and it was dark outside. McShan explained that there are no street lights where the victim was found.

Trooper Nickolas Hatton with the Texas Department of Public Safety testified that he was on duty on February 10, 2015. On that date, Hatton was dispatched to the scene, and he and his partner arrived at approximately 7:37, when it was dark. Upon arriving at the scene, he observed a white female lying in the ditch. Hatton explained that his partner photographed the scene, and the photographs were admitted into evidence. Based upon his training and experience, after he examined the victim, Hatton believed that the victim had been struck by a motor vehicle. Hatton testified that he was at the scene for several hours, and no one called or came forward during that time regarding involvement in the crash.

---

[1]Leeann Barnes, telecommunicator for the San Jacinto County Sheriff's Office, testified that she answered a 9-1-1 call regarding the victim at 7:36 p.m. on February 10, 2015. Barnes also testified that she received a 9-1-1 call from Duncan on the following day.

Hatton explained that he examined the roadway for clues. Hatton and his partner found the victim's running shoes, and Hatton believed that the location where they were found gave the authorities "an area of impact." According to Hatton, one of the victim's socks was also recovered. Hatton explained that the authorities placed an orange flag at every location where evidence was found to create a forensic map or scale diagram of the crash scene. Hatton and his partner also found areas where the grass was discolored, as well as areas that "appear to be a gouge or tumbling through the grass." Hatton explained that the gouge area was consistent with a person tumbling along the ground. According to Hatton, there were no skid marks in the area. Hatton testified that shattered glass pieces from a headlamp and its plastic outer edge were also found and collected as evidence, and he took them to a Chevrolet dealership to determine the make and model of the vehicle from which they came.

Hatton explained that Duncan contacted San Jacinto Communications and reported that he might have been involved in a crash on the date in question. Hatton testified that he subsequently spoke with Duncan and viewed Duncan's vehicle, which is a GMC Sierra.[2] Duncan told Hatton that he believed he may have been

[2]Hatton testified that Duncan signed a consent to search form.

4

involved in a wreck on February 10, 2015. Hatton testified that Duncan told him "he remembered striking something with his vehicle while traveling on FM 2666."

According to Hatton, his investigation revealed signs that Duncan's vehicle had been involved in a crash. Specifically, Hatton explained that Duncan's vehicle had been damaged on the front passenger side bumper, as well as the hood, the passenger side headlamp, and the fender. Hatton testified that the headlight parts he recovered were made of glass, as were the headlights on Duncan's vehicle, and when the pieces were assembled, they resembled the intact headlight on Duncan's vehicle and were made of the same material. Duncan agreed to come with Hatton to the Coldspring office after being given his *Miranda* warnings by Sergeant David Gustafson. According to Hatton, Duncan was informed that he was not under arrest, and Duncan agreed to give a statement, which the trial judge determined was voluntary after defense counsel objected.

According to Hatton, Duncan stated that he reached down to pick up a lighter and realized that he had struck something, which he believed was a deer or hog. According to Hatton, Duncan stated that he continued about a hundred feet and then stopped, walked around to the front passenger side of his vehicle, saw that his vehicle was damaged, and got back into his vehicle and drove away. Duncan stated that he did not return to the location farther up the road where he believed he hit something.

5

During cross-examination, Hatton agreed that it is not uncommon for someone in the wooded area of Coldspring to hit a hog or deer.

According to Hatton, the Texas Transportation Code requires the operator of a motor vehicle who has been involved in a crash involving bodily injury or death to stop as close as practicable to the crash scene and to verify whether there was a person involved. Hatton testified that if a person was involved in the accident, the driver must immediately determine whether that person requires aid. Hatton explained that the driver must also immediately return to the scene of the accident if the vehicle was not stopped at the scene.

Trooper Jake Pullen testified that he went with Hatton to the scene on February 10, 2015, and when they arrived on the scene, they saw a deceased female lying in a ditch. Pullen testified that when he placed his fingers on the victim's neck, "her skin felt cold and wet as if there was dew on her skin." Pullen testified that he was present at the victim's autopsy "to pull any evidence that we could and take pictures." According to Pullen, the victim's clothing was collected, as was DNA evidence in the form of blood and hair samples.

Gustafson testified that on the date in question, Hatton informed him that he was on the scene of a fatality crash, and Gustafson responded to the location and contacted Trooper Rae Shel Lee, who is a member of the state accident

6

reconstruction team. According to Gustafson, he received a phone call from the San Jacinto County Sheriff's Office, during which the operator stated that someone had contacted them and stated that he had been involved in a crash on the road in question, and his vehicle matched the description of the vehicle for which the authorities were searching. Gustafson testified that when he, Hatton, and another officer took the evidence to Martin Chevrolet, the parts manager said he was certain that the vehicle was either a GMC or Chevrolet, model year 1988 to 1998, and was a teal green color. According to Gustafson, the teal colored parts found at the scene matched Duncan's vehicle "identically." Gustafson explained that Duncan informed authorities that he had been involved in a crash the day before.

According to Gustafson, when he spoke with Duncan at Duncan's residence, he read Duncan his *Miranda* warnings and "made [it] very clear" to Duncan that he was not under arrest. Duncan told Gustafson that "he hit something that he thought was either a deer or maybe a hog. He didn't know for sure." Gustafson explained that Duncan agreed to provide a voluntary statement to the rangers who would be waiting for him at the Highway Patrol Office. Gustafson testified that Duncan was not handcuffed when he was put into the patrol vehicle. According to Gustafson, section 550.021 of the Transportation Code does not require that the person operating a vehicle know that he hit a person; rather the Transportation Code requires

7

that the driver determine whether he struck a person. Gustafson testified that the driver "must go back to the location of the scene of the accident, which [Duncan] did not do."

Ranger Brandon Bess with the Texas Department of Public Safety testified that Ranger Ryan Clendennen, the Ranger assigned to San Jacinto County, called him on February 11, 2015, and asked for his assistance regarding the investigation of the collision because Clendennen was busy with another matter. Clendennen informed Bess that an individual had contacted the dispatcher and reported that he might have been involved in the collision that killed the victim. Bess explained that he accompanied Clendennen to the crash scene, and he subsequently met Duncan at the Coldspring Highway Patrol Office. Bess explained that he did not read Duncan his *Miranda* rights before interviewing him. According to Bess, Duncan was not under arrest, and Duncan was not restrained in any way. Bess stated that he informed Duncan that he was free to leave, but a seventy-two hour hold was placed on Duncan after the interview. Bess testified that he recorded his conversation with Duncan, and the recording was admitted into evidence and played for the jury over defense counsel's objections that it constituted hearsay because it was not an admission by a party opponent.

8

According to Bess, after his interview with Duncan, the authorities "had an investigation that we needed to conduct." Bess testified that Duncan agreed to take a breath test, and no alcohol was detected. Bess explained that Duncan took the test close to midnight on the day after the accident, and he explained that alcohol does not stay in a person's system that long if the person is alive. Bess explained that he examined Duncan's vehicle and noted that the front-right fender of the vehicle, the hood, the windshield, the passenger's side mirror, and the roof had sustained damage. Bess testified that he saw what appeared to be blood or remnants of blood on the vehicle. According to Bess, Duncan stated that the vehicle did not have any damage prior to the accident.

Clendennen testified that on February 10, 2015, he learned of an auto-pedestrian fatality, and he contacted Gustafson the following day. Clendennen testified that he and Bess viewed the accident scene. Clendennen explained that Gustafson contacted him about Duncan, but because Clendennen was unable to take Duncan's statement, he asked Bess for assistance. After Duncan gave a statement to Bess, Clendennen learned of the vehicle that was possibly involved in the accident, and he viewed the vehicle at the Texas Department of Public Safety. Clendennen explained that the right front portion of the vehicle and the hood were damaged, as

9

was the bumper. According to Clendennen, blood spatter was also visible along the right front fender and passenger's side mirror.

Jimmy Jones of Martin Chevrolet's parts department testified that he assisted some officers with identifying the kind of vehicle from which the parts came, and after conducting internet research, they concluded that the parts were from a Chevrolet pickup. Jones explained that older models have glass headlamps, but the headlamps of newer models contain more plastic. Jones testified that there are no differences between the headlights of Chevy and GMC trucks. Jones testified that the parts could have come from Duncan's truck, but he does not know if they did.

Lee testified that she has received extensive training in the field of crash reconstruction and is a member of the state crash reconstruction team. Lee explained that Gustafson called her to assist with reconstructing the accident. Lee testified that upon arriving at the scene, she saw the victim, observed her injuries, and learned the victim's identity. Lee explained that it was dark when she arrived. According to Lee, Hatton, Pullen, and Gustafson assisted her with the reconstruction process. Lee testified that she observed the entire crash location that night, and saw "a large amount of debris." Lee explained that most of the debris consisted of pieces of glass from a headlamp lens, but there were also a few pieces of colored trim. Lee testified that she marked the location of each piece of debris and "held the flashlight for the

trooper that was collecting it." Lee explained that she also took measurements and photographs. Lee testified that because the pieces of the headlamp were glass, she believed that the vehicle involved was an older model pickup or SUV, but she did not know the make or model year of the vehicle.

Lee explained that she believed an auto-pedestrian crash had occurred, and that the victim's injuries were consistent with a fender wrap crash because she was struck at her center of mass. Lee explained that a gouge mark was consistent with the victim's body's first contact with the ground, and subsequent marks or gouges were consistent with her body tumbling or traveling along the ground. Lee testified that she believed that her work had become a criminal investigation because there was an accident involving the death of a person and no vehicle was at the scene. According to Lee, the damage to Duncan's vehicle, which she later observed at the highway patrol office, was consistent with the debris found at the crash scene. Lee also explained that there was what she believed to be blood spatter on the fender of Duncan's vehicle. Lee testified that, based upon the location of the victim's injuries and the location of the victim's body, she believed the victim "was jogging on or along that roadway somewhere and she was struck from behind by this vehicle."

Jennifer Pollock of the Texas Department of Public Safety Crime Laboratory in Houston testified that her team performed a forensic examination of Duncan's

11

vehicle at the highway patrol office and collected several samples during that process. Pollock analyzed the samples for DNA, compared them to a known profile, and found that the samples were from the victim. Jenny Lounsbury, a forensic scientist with the Texas Department of Public Safety, testified that she performed a trace analysis on the vehicle and four pieces of debris, and she observed that the debris physically matched the vehicle, both in color and fit.

Dr. John Ralston, chief forensic pathologist for Forensic Medical of Texas in Beaumont, testified that he performed an autopsy of the victim. During the autopsy, Ralston collected samples of the victim's hair and blood. Ralston testified that the victim suffered multiple injuries, including fractures of her skull, cervical spine, thoracic spine, ribs, femurs, and tears of the brain stem, spinal cord, and aorta, as well as multiple scrapes or abrasions to her skin. Ralston explained that the victim's injuries were "consistent with what's known as a bumper impact or point of impact injury[,]" and he testified that the force that struck the victim "appeared to be applied from behind." Ralston testified that a bumper like the one on Duncan's truck could have caused the victim's injuries. According to Ralston, no drugs or toxins were found in the victim's system. Ralston explained that the cause of the victim's death was "multiple injuries due to a motor vehicle striking a pedestrian[,]" and the manner

of death was accident. Various photographs of the autopsy were admitted into evidence over defense counsel's objection.

Ronnie Fulcher, a supervisor and shop hand at B & B Tire and Truck Services ("B & B"), testified that Duncan once worked for B & B as a driver and mechanic. According to Fulcher, Duncan was working for B & B on February 10, 2015, and Fulcher saw Duncan that day between 3:45 and 4:30 p.m. Fulcher explained that Duncan smelled faintly of stale alcohol, and Fulcher saw a beer in Duncan's truck and also saw Duncan drinking the beer. Fulcher testified that he later told a ranger that Duncan seemed distant and "heavily intoxicated[,]" and he also stated that Duncan's words were slurred. According to Fulcher, when Duncan arrived at work on February 11th, Duncan seemed "[a] little more stressed than usual[]" and was tapping his fingers and saying "the F-word."

Barbara Faircloth testified that Duncan lives with her niece, Christina Meek. Faircloth testified that she saw Duncan at her home on the date in question at approximately 4:30 p.m. According to Faircloth, Duncan was upset with her niece because he had found out that she had not made payments on his truck, and Duncan had a small paper bag with alcohol in it. Faircloth explained that she gave a recorded statement to Clendennen, during which she reported that she believed Duncan was intoxicated and that she was concerned about him operating a motor vehicle.

Faircloth testified that she never saw Duncan open the bottle or drink from it at her home, but Duncan "acted like he had been drinking before he got to my house." Faircloth told Clendennen that she believed the bottle contained whiskey. Faircloth explained that she told Duncan he should not be driving and she offered to drive Duncan home, but he "got in his truck and took off[.]"

David Davis testified that he saw Duncan at approximately 7:00 p.m. on the date in question. According to Davis, Duncan stumbled coming down some small steps, and Davis believed Duncan was drunk. Davis explained that Duncan seemed upset, and Duncan told Davis that he had run over something.

Duncan's mother, Agnes Walker, testified that she saw Duncan twice on February 10, 2015. According to Walker, Duncan came by her house at 5:00, and they discussed a Verizon bill about which Duncan was upset. When asked whether Duncan drinks whiskey or bourbon, Walker responded affirmatively, and she then added, "but he doesn't drive when he does it." Over defense counsel's objection, the trial court allowed the State to impeach Walker by showing her a judgment which indicated that Walker was convicted of driving while intoxicated in 1994, and she admitted that he did drink and drive when he was twenty-one years old. Walker testified that Duncan returned to her home shortly after 7:00 p.m. According to Walker, Duncan seemed somewhat upset because he thought he had hit a deer and

14

damaged the truck he had just acquired. Walker testified that Duncan told her that he had dropped his cigarette lighter, and when he raised up, he had hit something. According to Walker, Duncan said that all he saw was fur, and Duncan "said it could've been a deer or it could've been a man." Walker explained that Duncan said that whatever he hit was "[r]unning down the road or something." Walker testified that when she heard about the victim on the police scanner in her home, she called Duncan. Duncan told his mother that he had been on a different road than the one where the crash occurred.

Christina Meek testified that she lived with Duncan in February 2015. According to Meek, she and Duncan had spent the weekend before the date in question at a lake house, and they got into an argument regarding the truck note and a cell phone bill. Meek explained that she and Duncan returned to their home on February 10, and they went to get another vehicle. According to Meek, Duncan had consumed one beer. Meek testified that along the way, she purchased a "tallboy" Busch beer for Duncan, and he drank it. According to Meek, Duncan also consumed a twelve-ounce beer when they reached their destination. Meek explained that the argument she had with Duncan began after he had consumed the beers. Meek testified that Duncan intended to go to Verizon to inquire about the cell phone bill, and Meek did not believe Duncan should have been operating a motor vehicle

15

"[b]ecause he had already had three beers in him." Meek opined that Duncan was "intoxicated, but not highly intoxicated."

Meek explained that she did not hear about the accident until the next day. According to Meek, Duncan awakened her in the early morning hours of February 11 and told her that he had hit "something" or "someone." Meek testified that Duncan told her he had struck a deer or hog, but that Duncan also said that it could have been "someone." According to Meek, Duncan told her that he needed to return to the truck because he believed he had left a beer inside the truck.

Duncan testified that on the morning of February 10, 2015, he was at a lake house with Meek. According to Duncan, after he and Meek returned home, they got into an argument. Duncan testified that Meek stopped and bought him a beer, but Meek was driving at that time. According to Duncan, Meek also bought him a beer "for later to put in the icebox at the house." Duncan testified that he and Meek argued again at approximately 3:00 p.m. Duncan denied drinking while they were arguing. According to Duncan, Meek got tired of arguing, said she was going to Trinity, and handed him the beer out of the car. Duncan testified that he laid the beer in the front seat of the truck. Duncan denied consuming any other alcoholic beverages.

Duncan testified that after unsuccessfully attempting to obtain a battery for the truck, he decided to go to the Verizon store, and he learned that his outstanding

16

bill was almost $2000. Duncan explained that he became angry, and after leaving Verizon, he bought a bottle of R&R whiskey and went to his mother's home. Duncan testified that he did not open the bottle of R&R, did not consume alcohol at his mother's home, and was not intoxicated when he arrived at her home. Duncan testified that he went to take care of his horse, and he decided to leave that location at approximately 6:00 p.m., when it was dusk, and to return to his mother's home. Duncan stated that he was not drinking and was not intoxicated.

Duncan testified that as he was driving, he reached down to retrieve his cigarette lighter from the seat, and he "hit something." He estimated that the collision occurred at approximately 7:00 p.m. Duncan explained that he looked up and did not see anything, and he then applied his brakes and stopped. Duncan testified, "I got out to see what I hit and then see what the damage was to the truck" because he believed that the headlights were not working. Duncan testified that he did not go back to the point of impact to see if he hit anything, but he got out, walked around the front of the truck, and looked to make sure that whatever he hit was not underneath the truck. According to Duncan, he walked around to the passenger side of the truck and looked down the ditch line but did not see anything, so he assumed he had struck a deer or hog. Duncan testified that he never walked past the end of his vehicle.

17

Duncan testified that he decided to return to Shepherd, where his daughter and son-in-law reside. After realizing that they were not at home, he called his brother and told him that he needed a ride home because he had hit a deer or hog. According to Duncan, the bottle of whiskey was still in the front seat of his truck, unopened. Duncan testified that he returned to his mother's house and told her that he had hit a deer or hog, and he denied telling his mother that he thought he might have hit someone who was jogging. Duncan explained that his brother arrived and took him back to Cleveland.

Duncan testified that his mother called to tell him that the victim had been struck on 2666 about eight miles out, but Duncan explained that he did not believe he was involved in that accident because he was closer to a different road. According to Duncan, Meek later came home after he was already asleep, and he spoke to her when he got up to go to work. Duncan testified that he subsequently received another telephone call from his mother, during which his mother told him that the victim had been struck while jogging and green paint had been found, so Duncan decided to contact the San Jacinto County Sheriff's Department, and he told them that he thought he hit a deer or hog on 2666. Duncan testified that if he had realized he had struck a person, he would have waited and called "E.M.S. or 9-1-1 or something." Duncan stated, "I wouldn't have left the person laying on the side of the road."

18

During cross-examination, Duncan testified that he had been convicted of the federal offense of possession of a firearm by a felon, as well as possession of cocaine in Harris County. Duncan admitted that he was the only person operating the truck that day, and that the vehicle was involved in an accident, but he denied knowing that he struck anyone. Duncan denied seeing any of the victim's blood and tissue on his truck. Duncan testified that he stopped about one hundred feet from the scene of the accident. Duncan testified that he did not investigate to see if a person was involved and needed assistance. Duncan denied telling Meek that he had hit someone. During rebuttal, Bess testified that Duncan said in his statement that he pulled over after "probably about 100 yards."

## ISSUES ONE, TWO, THREE, FOUR, FIVE, AND SIX

In issue one, Duncan challenges the legal sufficiency of the evidence to prove that he knew he had struck a human being when he left the location, and in issue two, Duncan challenges the factual sufficiency of the evidence to prove that he knew he had struck a human being when he left the scene. In issue three, Duncan asserts that he made a diligent inquiry and formed a reasonable belief that he had only struck an animal, and that his leaving the scene was justifiable. In issue four, Duncan contends the evidence was legally insufficient because the State did not negate mistake of fact. In issue five, Duncan argues that there was legally insufficient

19

evidence that he had the requisite knowledge that he had struck a human being with his vehicle, and in issue six, Duncan challenges the legal sufficiency of the evidence that he had intentionally and knowingly failed to stop and render aid to a human being. We address these issues together.

In a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). The jury is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). In 2010, the Court of Criminal Appeals concluded that there is no meaningful distinction between a legal-sufficiency review and a factual-sufficiency review and held that "the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal

20

offense that the State is required to prove beyond a reasonable doubt. All other cases

to the contrary . . . are overruled." *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim.

App. 2010).

Section 550.021 of the Texas Transportation Code, which defines the offense

of failing to stop and render aid, provides as follows, in pertinent part:

(a)  The operator of a vehicle involved in an accident that results or is reasonably likely to result in injury to or death of a person shall:

(1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident;

(3) immediately determine whether a person is involved in the accident, and if a person is involved in the accident, whether that  person requires aid; and

(4) remain at the scene of the accident until the operator complies with the requirements of Section 550.023.

. . . .

(c) A person commits an offense if the person does not stop or does not comply with the requirements of this section. An offense under this section:

(1) involving an accident resulting in:

(A) death of a person is a felony of the second degree[.]

Tex. Transp. Code Ann. § 550.021(a), (c) (West Supp. 2017). Section 550.023 requires the operator of a vehicle that is involved in an accident resulting in the injury or death to a person to provide his name, address, vehicle registration number, and liability insurer to any person injured, show his driver's license, and provide assistance to any person injured in the accident if it is apparent that treatment is necessary. *Id.* § 550.023 (West 2011).

Because section 550.021 does not prescribe a culpable mental state for the offense, the State must prove that Duncan acted with one of the culpable mental states found in section 6.02 of the Texas Penal Code. *See* Tex. Penal Code Ann. § 6.02(b) (West 2011) (providing that if a culpable mental state is not described by the definition of the offense, one is nevertheless required "unless the definition plainly dispenses with any mental element[]"); *Id.* § 6.02(d) (setting forth the culpable mental states, from highest to lowest). The Court of Criminal Appeals has held that the State satisfies this burden by showing that "the accused had knowledge of the circumstances surrounding his conduct, i.e., had knowledge that an accident had occurred." *Goss v. State*, 582 S.W.2d 782, 785 (Tex. Crim. App. 1979) (internal citation omitted). As our sister Court of Appeals ably explained, the 2015 amendment to section 550.021 added the requirement that the driver immediately determine whether a person is involved in an accident, and that any further addition

22

to the statute would be mere surplusage if the State were required to prove the driver knew that the accident involved death or injury to a person before the State could show that the driver shirked his duty to stop and render aid. *Mayer v. State*, 494 S.W.3d 844, 849-50 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). The elements of the offense of failure to stop and render aid are as follows: (1) an operator of a vehicle; (2) intentionally or knowingly; (3) involved in an accident; (4) resulting in injury or death of any person; (5) fails to stop and render reasonable assistance. *McCown v. State*, 192 S.W.3d 158, 162 (Tex. App.—Fort Worth 2006, pet. ref'd). "[T]he knowledge requirement of section 550.023 is satisfied if an objective examination of the facts shows that it would be apparent to a reasonable person that someone has been injured in an accident and is in need of reasonable assistance." *Id.* at 163. Section 8.02 of the Texas Penal Code provides as follows: "It is a defense to prosecution that the actor through mistake formed a *reasonable* belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code Ann. § 8.02(a) (West 2011) (emphasis added).

The jury heard evidence that Duncan had argued with Meek on the day of the accident, Duncan had consumed three beers before the accident, and Duncan was intoxicated. In addition, the jury heard evidence, including Duncan's own testimony,

that Duncan knew he had struck something, but he nevertheless proceeded for either a hundred feet or a hundred yards and stopped, walked around to the passenger side of his vehicle to assess the damage, and got back into his vehicle and drove away without returning to the point of impact or walking past the end of his vehicle. The jury also heard evidence from Meek and Walker that Duncan told them he struck either an animal or a person. Additionally, the jury heard evidence that the victim was lying in the ditch and had visible injuries.

The State was not required to prove that Duncan knew that he had struck a human being; rather, the State was required to prove Duncan had knowledge of the circumstances surrounding his conduct, *i.e.*, Duncan knew that an accident had occurred. *See Goss*, 582 S.W.2d at 785; *Mayer*, 494 S.W.3d at 849-50. The State was required to prove that Duncan operated a vehicle, was involved in an accident that resulted in the victim's death, and intentionally or knowingly failed to stop and render reasonable assistance. *See McCown*, 192 S.W.3d at 162. It was within the province of the jury to weigh the testimony and to resolve any conflicts in the testimony. *See Hooper*, 214 S.W.3d at 13. The jury could have concluded that Duncan's alleged mistaken belief that he struck an animal was not reasonable under the circumstances. *See* Tex. Penal Code Ann. § 8.02(a). Finally, as explained above, the Court of Criminal Appeals has directed that we no longer review evidence for

24

factual sufficiency in criminal cases. *See Brooks*, 323 S.W.3d at 912. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Hooper*, 214 S.W.3d at 13. The evidence is legally sufficient to support the verdict. Accordingly, we overrule issues one, two, three, four, five, and six.

### ISSUES SEVEN, EIGHT, NINE, TEN, AND ELEVEN

In issue seven, Duncan argues that the three convictions, which he identifies as State's exhibits 115A, 120, and 121, are over ten years old, did not involve moral turpitude, and were not shown to have the probative value required by Rule 609(b) of the Texas Rules of Evidence. In issue eight, Duncan contends that the use of one of the convictions for impeachment during guilt-innocence was reversible error because Duncan's alleged lack of an appointed attorney when he pleaded guilty renders the conviction void and a structural constitutional error. In issue nine, Duncan complains that the admission of a 1994 judgment for which he served time violated Article 37.07, section 3(i) of the Texas Code of Criminal Procedure. In issue ten, Duncan argues that the trial court erred by admitting the 1994 judgment in both guilt-innocence and punishment, "not only for impeachment, but also to increase [the] sentence length assessed[.]" In issue eleven, Duncan argues that the numerous convictions were admitted in violation of Rule 609(b) of the Texas Rules of

25

Evidence and without "essential findings or limiting instructions, thereby necessitating reversal."[3] We address these issues together.

The record reflects that State's exhibit 115A is a judgment stating that Duncan pleaded guilty to driving while intoxicated in San Jacinto County in 1994; State's exhibit 118 is a judgment indicating that Duncan pleaded guilty to the federal offense of being a felon in possession of a firearm; State's exhibit 119 is a judgment which states that Duncan pleaded guilty to possession of cocaine in Harris County in 2006; State's exhibit 120 is a judgment which indicates that Duncan pleaded guilty to driving with a suspended license in Polk County in 1995; and State's Exhibit 121 is a judgment reflecting that Duncan pleaded guilty to possession of methamphetamine in Liberty County in 2004.

As discussed above, exhibit 115A was initially mentioned by the State during its questioning of Walker. The prosecutor asked whether Duncan drinks whiskey or bourbon, and Walker responded affirmatively, and she then volunteered, "but he doesn't drive when he does it." Over defense counsel's objection that Rule 609 only allows impeachment of a person with his own conviction and that the conviction is

---

[3]Although Duncan does not explicitly identify exhibits 118 and 119 in his issues, we will also address the admission of those convictions because he discusses them in his brief.

over fifteen years old,[4] the State impeached Walker by showing her the judgment which indicated that Walker was convicted of driving while intoxicated in 1994, questioning her about it, and having her testify that it was true. However, the record reflects that exhibit 115A was not admitted into evidence until the punishment phase.

During cross-examination, Duncan admitted that he had been convicted of the offenses referenced in exhibits 118 and 119. The State offered exhibits 118 and 119 into evidence during its cross-examination of Duncan, but withdrew the exhibits after defense counsel objected, and they were not admitted into evidence until the punishment phase. The record reflects that exhibits 120 and 121 were not offered and admitted into evidence until the punishment phase. Defense counsel stated "No objections[]" when exhibits 115, 118, 119, 120, and 121 were offered and admitted into evidence during the punishment phase.

Duncan asserts that he lacked counsel when he pleaded guilty to the conviction reflected in exhibit 115A because the line on the judgment where his attorney's name should be is blank, and that the use of exhibit 115A for impeachment was structural constitutional error. Duncan is correct that a prior conviction obtained in violation of a defendant's right to counsel is void and cannot be used for purposes

---

[4]While objecting, defense counsel conceded that there "may be a slight door that's opened[.]"

of either guilt or enhancement or punishment in a subsequent case. *Burgett v. Texas*, 389 U.S. 109, 115 (1967). Although the places on the 1994 judgment where defense counsel's name should be were left blank, that fact, standing alone, does not facially establish that Duncan was not represented by counsel. *Cf. Burgett*, 389 U.S. at 112, 115 (holding that lack of counsel was demonstrated when the judgment affirmatively stated that the defendant came "without counsel"); *see Baxley v. State*, 547 S.W.3d 266, 2018 WL 1701843, at *2 (Tex. App.—Texarkana 2018, pet. ref'd) (distinguishing a judgment that does not conclusively reflect that the defendant had counsel from the judgment at issue in *Burgett*). When a judgment does not show on its face that it was obtained without assistance of counsel, the attack on the prior judgment is collateral, and "'the record must leave no question about the existence of the fundamental defect.'" *Baxley*, 2018 WL 1701843, at *3 (quoting *Nix v. State*, 65 S.W.3d 664, 668-69 (Tex. Crim. App. 2001)). The appellant has the burden to show that he was indigent and did not voluntarily waive his right to counsel. *Id*. (citing *Chancy v. State*, 614 S.W.2d 446, 447 (Tex. Crim. App. [Panel Op.] 1981)). "'If the record is incomplete, and the missing portion could conceivably show that the defect does not in fact exist, then the judgment is not void, even though the available portions of the record tend to support the existence of the defect.'" *Id*. (quoting *Nix*, 65 S.W.3d at 668-69).

The record does not establish that Duncan was indigent at the time of the 1994 conviction, and Duncan did not establish those facts by testimony or other evidence. As stated above, defense counsel agreed to the admission of the 1994 judgment during the punishment phase, and the document was not admitted into evidence during guilt-innocence. Duncan did not conclusively establish that the 1994 judgment is void.[5]

Rule 609 provides that a witness may only be impeached through a conviction of a felony or crime of moral turpitude. Tex. R. Evid. 609(a)(1). However, an exception to the limitations of Rule 609 exists when the witness opens the door by leaving a false impression with the jury. *See Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993) (explaining that a defendant who created a false impression about his criminal history could be impeached with a prior misdemeanor conviction for public intoxication); *see also Monkhouse v. State*, 861 S.W.2d 473, 476 (Tex. App.—Texarkana 1993, no pet.). We see no reason why the rule should be different when the witness claiming law-abiding behavior by the defendant is someone other than the defendant. *See generally Delk*, 855 S.W.2d at 704. In addition, viewing the

_____

[5]The State attached to its brief a document purporting to be a waiver of counsel by Duncan in the 1994 case. However, we may not consider attachments to briefs that were not properly made part of the appellate record. *See* Tex. R. App. P. 34.1; *Till v. Thomas*, 10 S.W.3d 730, 733 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

29

record as a whole, we cannot say that the trial court allowing the State to impeach Walker with Duncan's 1994 conviction had more than a slight influence on the verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (holding that a substantial right is affected when the alleged error had a substantial and injurious effect in determining the jury's verdict); *see also* Tex. R. App. P. 44.2(b).

Article 37.07, section 3(i) of the Texas Code of Criminal Procedure provides that "[e]vidence of an adjudication for conduct that is a violation of a penal law of the grade of misdemeanor punishable by confinement in jail is admissible only if the conduct upon which the adjudication is based occurred on or after January 1, 1996." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(i) (West Supp. 2017).[6] Even if the admission of the 1994 conviction into evidence during the punishment phase was erroneous, viewing the entire record as a whole, including Duncan's four other prior convictions, we cannot say that the admission of the 1994 conviction (State's Exhibit 115A) into evidence had more than a slight influence on the verdict. *See King*, 953 S.W.2d at 271; *see also* Tex. R. App. P. 44.2(b). In light of the record as a whole, including Duncan's admissions to the convictions reflected in exhibits 118 and 119, we conclude that any error in the State mentioning exhibits 118 and 119 during

---

[6]Because the amendments to Article 37.07 do not materially affect the outcome of this appeal and do not affect subsection (3)(i), we cite to the current version of the statute.

30

cross-examination and initially offering them into evidence was harmless. *See King*, 953 S.W.2d at 271; *see also* Tex. R. App. P. 44.2(b). In addition, as discussed above, defense counsel did not object to the admission of exhibits 115A, 118, 119, 120, and 121 into evidence during the punishment phase. *See* Tex. R. App. P. 33.1(a); *Webb v. State*, 760 S.W.2d 263, 275 (Tex. Crim. App. 1988) (holding that it is axiomatic that motions in limine do not preserve error). For all of the foregoing reasons, we overrule issues seven, eight, nine, ten, and eleven.

### ISSUES TWELVE, THIRTEEN AND FOURTEEN

In issue twelve, Duncan argues that Ralston's opinion testimony was legally insufficient evidence to prove that a motor vehicle caused the victim's death. In issue thirteen, Duncan asserts that Ralston's opinion testimony was insufficient to prove that Duncan's motor vehicle caused the victim's death, and in issue fourteen, Duncan argues that Ralston's opinion testimony is "legally insufficient to prove the agency of appellant as part of the corpus delecti of the offense[.]" We address these issues together.

As discussed above, Ralston testified that the victim's injuries were consistent with a point of impact injury from behind and that a bumper like the one on Duncan's vehicle could have caused the victim's injuries. Ralston also testified that the victim's cause of death was multiple injuries due to being struck by a vehicle.

31

Duncan's arguments regarding Ralston's testimony ignore the other evidence, including: Scott's testimony that the victim was jogging on the evening she died; Hatton's testimony that, based upon his training and experience, he believed the victim had been struck by a motor vehicle; Hatton's testimony regarding the damage to Duncan's vehicle and the resemblance of the debris to the intact headlight of Duncan's vehicle; Duncan's statements and trial testimony that he knew he had struck something; Gustafson's testimony that the parts found at the scene matched Duncan's vehicle identically; Lee's testimony that the victim's injuries were consistent with a fender wrap crash; Pollock's testimony that DNA samples from Duncan's vehicle were from the victim; Lounsbury's testimony that the debris matched Duncan's vehicle; and the testimony of Walker and Meek that Duncan told them he hit something or someone. Duncan cites no authority supporting the proposition that Ralston's testimony, standing alone, must be legally sufficient to prove that a motor vehicle driven by Duncan caused the victim's death. The totality of the evidence is sufficient to support the verdict. *See Hooper*, 214 S.W.3d at 13. We overrule issues twelve, thirteen, and fourteen.

ISSUES FIFTEEN, SIXTEEN, SEVENTEEN, AND EIGHTEEN

In issue fifteen, Duncan argues that he was not given the warnings required by article 38.22 of the Texas Code of Criminal Procedure before giving a statement to

32

law enforcement. In issue sixteen, Duncan contends that the trial court abused its discretion by admitting his recorded statements as evidence because he did not receive the warnings required by article 38.22. In issue seventeen, Duncan asserts that because "lawmen" had arranged his statement, physically took him to the station, towed his vehicle, and subsequently arrested him, his Fifth and Fourteenth Amendment rights were violated by recording his statement without first giving warnings as provided by article 38.22. In issue eighteen, Duncan argues that since he received no warnings under 38.22 and a complete tape of his statement was admitted as evidence, "reversal is required." We address these issues together.

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Id*. The test for abuse of discretion is whether the ruling was arbitrary or unreasonable. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). An oral statement by an accused as a result of custodial interrogation is inadmissible in a criminal proceeding unless the statement reflects that he was warned (1) of his right to remain silent and to refuse to make a statement, (2) any statement may be used as evidence; (3) he has the right to have an attorney present to advise him before and during questioning; (4) if he is indigent, an attorney will be appointed to advise

him before and during questioning; (5) he may terminate the interview at any time; and (6) before making the statement, he knowingly, intelligently, and voluntarily waived the aforementioned rights. Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2(a), 3 (West 2018); *see also Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). By its express terms, article 38.22 applies only to statements made as a result of custodial interrogation. Tex. Code Crim. Proc. Ann. art. 38.22, § 3. The defendant bears the initial burden to establish that his statement resulted from a custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

Duncan testified that he contacted the San Jacinto County Sheriff's office. In addition, as previously discussed, Hatton testified that Duncan was informed that he was not under arrest, and Duncan agreed to give a statement. Gustafson explained that Duncan was not handcuffed when he was put into the patrol vehicle, and Duncan agreed to provide a voluntary statement to the rangers who would be waiting for him at the Highway Patrol Office. On the recording of his statement, Duncan was asked for his name, date of birth, social security number, address, and driver's license number. Ranger Bess then informed Duncan that he was not under arrest, was "not going to be arrested tonight[]," "that's the door[,]" "it's unlocked[,]" and "you're free to go at anytime[,]" and Duncan stated that he understood. We hold that the evidence authorized the trial court to find that Duncan's statement was not the

product of a custodial interrogation, and that the warnings provided in article 38.22 were therefore not required. Accordingly, we conclude that the trial court did not abuse its discretion by admitting Duncan's recorded statement into evidence. We overrule issues fifteen, sixteen, seventeen, and eighteen.

## ISSUE NINETEEN

In issue nineteen, Duncan argues that the punishment verdict is ambiguous and must be reversed because the jury did not state whether it does or does not assess a fine. Underneath the paragraph in which the jury assessed the term of Duncan's confinement, the punishment verdict form stated "In addition thereto, WE DO/WE DO NOT assess a fine in the amount of $2500.00 (not to exceed $10,000). Although the jury did not circle either "we do" or "we do not," there would be no reason for the jury to have written in "$2500.00" unless its intent was to assess a $2500 fine. We reject Duncan's contention that the punishment verdict is ambiguous. Accordingly, we overrule issue nineteen. Having overruled all of Duncan's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on March 15, 2018
Opinion Delivered July 25, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.